## WOODLAND MANOR III ASSOCIATES

v.

## Timothy R.E. KEENEY, in His Capacity as Director of the Rhode Island Department of Environmental Management.

No. 97–68–Appeal.

Supreme Court of Rhode Island.

June 25, 1998.

Joseph Avanzato, Providence/John B. Webster, Warwick, Patricia Rocha/Edward L. Maggiacomo, Providence, for Plaintiff.

Michael L. Rubin, Catherine Robinson Hall, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of the plaintiff, Woodland Manor III Associates, from a summary judgment entered in favor of the defendant, Timothy R.E. Keeney, in his capacity as director of the Rhode Island Department of Environmental Management.[1] For the following reasons, we sustain the appeal.

### Facts and Procedural History

The history of this case spans nearly twenty-five years. On or about February 4, 1974, Mapleroot Development Corporation (Mapleroot), by and through its president, John

---

1. This action was originally filed against Robert L. Bendick, Jr., in his capacity as director of DEM. Subsequent to the filing of this appeal, Andrew McLeod succeeded Timothy Keeney as DEM Director.

Assalone (Assalone), filed a "Request for Freshwater Wetlands Applicability Determination" with the Rhode Island Department of Environmental Management (DEM), pursuant to G.L.1956 §§ 2–1–18 through 2–1–22. Mapleroot planned construction on an eighty-nine acre tract of land it owned in Coventry, Rhode Island.[2] A site plan was submitted along with the request. The proposal contemplated a "Planned Unit Development" that included various types of buildings to be combined as an integrated whole, with construction to occur in phases: phase 1, an apartment complex (Woodland Manor I); phase 2, a housing facility for the elderly (Woodland Manor II); phase 3, a nursing home (Coventry Health Center); and phase 4, a condominium complex (Woodland Manor III).

Following a site inspection and review of Mapleroot's request, DEM notified Mapleroot in correspondence dated June 17, 1974 (1974 letter), that:

"*[p]rovided there is no construction or regrading below the 147.5 foot contour as shown on the above referenced plan and that final grading and drainage plans and computations are submitted for review and approval* of this Department prior to start of construction, it is our conclusion that the Fresh Water Wetlands Act does not, at this time, appear applicable to this proposal." (Emphasis added.)

The parties agreed that the reference in DEM's letter to a 147.5–foot contour line was erroneous; it should have read "the *247.5* foot contour" line.

After receiving the 1974 letter, Mapleroot proceeded to present the proposed project to the various state and local regulatory agencies whose approvals were required for construction and completion of the development. In so doing, Mapleroot expended substantial sums of money on site preparations, including the design and installation of a 3.5–mile sewer system to service the multiphase project. In 1978, pursuant to the terms of the 1974 letter regarding review of final grading

and drainage plans, Mapleroot submitted a site plan for phase 1 to DEM, and DEM subsequently notified Mapleroot in a letter dated June 29, 1978, that "[u]nder the following provisions: Adequate measures are taken to prevent sediments from entering adjacent wetlands, * * * it is our conclusion that *the Fresh Water Wetlands Act does not appear applicable to this proposal.*" (Emphasis added.) Likewise, in response to a subsequent site plan for phase 2, DEM indicated in a letter dated January 15, 1980, that

"[u]nder the following provisions: 1. Only work specifically shown on the aforementioned site plan is allowed; 2. Adequate measures are taken to prevent sediments from entering adjacent wetlands * * *; 3. The drainage excavation at the southeastern edge of the project must conform to the proposed contours approved * * *, it is our conclusion that *this proposal represents an insignificant alteration of a fresh water wetland. Therefore, under the aforementioned provisions, a permit to alter fresh water wetlands will not be required.*" (Emphasis added.)

The required proposal for phase 3 received a similar response from DEM, which advised in a letter dated January 19, 1981, that

"[u]nder the following provisions: 1. Only work specifically shown on the aforementioned site plan is allowed. 2. Adequate measures are taken to prevent sediments from entering adjacent wetlands * * *, it is our conclusion that *this proposal represents an insignificant alteration of a fresh water wetland. Therefore, under the aforementioned provisions, a permit to alter fresh water wetlands will not be required.*" (Emphasis added.)

The genesis of the instant controversy occurred in 1986, after the first three phases of Mapleroot's 1974 proposal had been completed. In a manner consistent with its past practices, Mapleroot submitted a site plan for phase 4 to DEM. In correspondence dated August 28, 1986 (1986 denial letter), DEM advised:

---

**2.** At the time of Mapleroot's request, DEM was known as the Department of Natural Resources. Pursuant to P.L.1977, ch. 182, § 2, the department's name was changed to the Department of

Environmental Management. For the sake of consistency, we refer to the department throughout this opinion as DEM.

"It is our conclusion that this proposal represents a SIGNIFICANT ALTERATION of a Fresh Water Wetland for the following reasons.

"Proposed alteration, including filling, vegetative clearing, grading, building construction, tennis court and drainage installation will result in encroachment, significant loss, disturbance and alteration of the natural characteristics of a freshwater wetland, adversely impacting wildlife habitat value, recreational value, and ground water recharge and quality. Be advised that the public value of the wetland, its outstanding wildlife habitat value and its location within one of this State's primary ground water reservoirs, require that the wetland receive the highest level of protection. *As proposed, this project has the highest probability of being denied* by the Department's Freshwater Wetlands Section.

"Therefore, a FORMAL application must be made on the enclosed form before further action can be taken by this Department. Upon receipt of your application, this Department will proceed with its processing as required by law." (Emphasis added.)

Following the 1986 denial letter, the parties scheduled a series of meetings in an attempt to resolve the matter. Resolution efforts having failed, Maploroot commenced this action on May 10, 1989, seeking declaratory judgment, injunctive relief, and damages. Specifically, Maploroot alleged that "[t]o require the filing of [a] new application at this date is in contradiction to the terms of the approval of [1974] and would prejudice Maploroot * * * inasmuch as DEM contends that the subject wetland is now unique and would result in the denial of the final phase of the construction as originally proposed and approved in [1974]." Maploroot sought, inter alia, a declaration that DEM was equitably estopped from requiring the filing of a new application for phase 4 and claimed damages "for the DEM's arbitrary, capricious and unreasonable actions which have unnecessarily delayed [Maploroot] and denied it beneficial use of its property for a time certain."

During the course of litigation, Maploroot conveyed by warranty deed dated September 30, 1992, the approximately twenty acres on which phase 4 was to be constructed to Woodland Manor III Associates (Woodland), a limited partnership. Assalone was listed as one of five limited partners on Woodland's Certificate of Limited Partnership, which was filed with the Office of the Secretary of State on September 29, 1992—one day before the conveyance. On October 14, 1992, the parties filed a stipulation agreeing that Woodland would be substituted as plaintiff in this action pursuant to Rule 25(c) of the Superior Court Rules of Civil Procedure. Woodland partner Anthony L. Giordano's motion to substitute Woodland as plaintiff was subsequently granted.

The trial justice issued a decision on February 10, 1994, following a two-day trial without the intervention of a jury. Addressing DEM's claim that by failing to submit a formal application as requested in the 1986 denial letter, Woodland (and its predecessor in interest, Maploroot) had not exhausted available administrative remedies, the trial justice ruled that "[b]y stating in the 1986 letter [that] 'this project has the highest probability of being denied by the Department's Freshwater Wetlands Section,' [DEM] established the futility of pursuing administrative procedures to resolve the dispute. Accordingly, the exhaustion requirement does not bar this action." The trial justice made several findings: "the design and construction of the entire project was predicated on the developer being able to build up to the 247.5 foot elevation"; plaintiff had completed substantial performance of the 1974 proposed project; such performance had been completed in good faith reliance on the 1974 letter; and DEM had "delimit[ed][its] jurisdiction" by establishing the 247.5 foot contour line in 1974. Judgment for Woodland was entered on March 29, 1994, whereby DEM was "equitably estopped from requiring a formal wetlands application on the basis of any disturbance above the 247.5 foot elevation that does not adversely impact areas below the elevation and otherwise within the [DEM's] jurisdiction," and was ordered to "process the final phase of construction and review the plans submitted

with final grading and drainage for the final phase of construction in accordance with the terms of the June 1'', 1974 permit [*sic*]."

Following the 1994 decision, Woodland moved to amend its complaint to assert that the actions of DEM between the time of the 1986 denial letter and the 1994 decision constituted a temporary taking of Woodland's property. Specifically, Woodland sought to amend its complaint by seeking "damages as the Defendant has unjustifiably and unreasonably interfered with the use and enjoyment of the Plaintiff's property resulting in temporary inverse condemnation pursuant to the Fifth Amendment to the United States Constitution as provided for pursuant to 42 U.S.C. § 1983."[3] The DEM objected to Woodland's motion to amend, asserting that the amendment was "unnecessary and unwarranted" because Woodland had waived its claim for damages during trial; DEM then filed a motion for summary judgment, arguing that there was no genuine issue of material fact, given Woodland's alleged waiver of the damages claim.

At a subsequent hearing before the trial justice, counsel for Woodland stated that "[o]ur client has made a decision that it's impossible, impractical, financially infeasible to proceed with the apartment complex that it had intended to build on this land in 1987 or earlier, and [that] to revise the plans, the DEM plans, and to build the apartment complex that was originally intended is just financially infeasible." Thereafter, an order was entered granting Woodland's motion to amend and denying DEM's motion for summary judgment.

On March 7, 1996, DEM filed a second motion for summary judgment (1996 motion), asserting that "the undisputed material facts reveal that there was no compensable taking of [Woodland's] property." Following a hearing, the trial justice issued a decision

granting the motion, finding that "the procedural intricacies of this case and this Court's 1994 estoppel decision fail to transform DEM's actions into an extrajurisdictional exercise." The trial justice further found that "[s]ummary judgment is warranted because the initial permit requirements which form the basis of [Woodland's] takings claim amount to nothing more than a mere assertion of jurisdiction by the DEM [and are] insufficient as a matter of law to constitute a taking." Judgment entered on January 2, 1997, and Woodland filed a timely notice of appeal to this Court.

## Standard of Review

▮▮▮▮ It is well settled that this Court reviews the granting of a summary judgment motion on a de novo basis. *Marr Scaffolding Co. v. Fairground Forms, Inc.*, 682 A.2d 455, 457 (R.I.1996). In conducting such a review, we are "bound by the same rules and analysis as those employed by the trial justice," *Rotelli v. Catanzaro*, 686 A.2d 91, 93 (R.I. 1996), and "[a]ccordingly, we will affirm a summary judgment if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Id.*

## Discussion

We take as our starting point the observation in *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir.1983),[4] that even though "the law of just compensation is hardly a model of clarity[,] * * * [t]he fact-intensive nature of just compensation jurisprudence * * * argues against precipitous grants of summary judgment."

▮▮ This Court, after having considered the takings analyses of the United States

---

**3.** The amended complaint erroneously listed Mapleroot as plaintiff in the action.

**4.** Yuba, the plaintiff corporation, sued the United States to confirm title to its alleged mineral rights on federal land. *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 886 (Fed.Cir.1983). Yuba sought compensation for the six-year period during which it had been denied the opportunity to mine the land by the United States. *Id.*

The Claims Court granted the United States's motion for summary judgment, determining in part that the United States had "only asserted a claim to its rightful ownership subject to judicial determination." *Id.* The Federal Circuit Court of Appeals vacated the order granting the government's motion for summary judgment and remanded the case for trial. *Id.* at 891.

Supreme Court, has held that the physical invasion of property is not a necessary predicate to a compensable takings claim. "A regulatory taking may result from 'a radical curtailment of a landowner's freedom to make use of his or her land; that is, by regulatory action which is neither a physical invasion nor a physical restraint.'" *Alegria v. Keeney*, 687 A.2d 1249, 1252 (R.I.1997) (quoting 26 Am.Jur.2d *Eminent Domain* § 10 at 453 (1996)); *see also Brunelle v. Town of South Kingstown*, 700 A.2d 1075, 1082 (R.I.1997) ("Governmental action short of actual acquisition of property may be a constructive taking or inverse condemnation")(quoting *E & J Inc. v. Redevelopment Agency of Woonsocket*, 122 R.I. 288, 290, 405 A.2d 1187, 1189 (1979)). "Although courts have not devised an easy litmus test" to assess "a takings claim resulting from regulations that constrain the use of property, as opposed to outright physical appropriations," *Alegria*, 687 A.2d at 1251–52, general principles may be gleaned from existing case law.

The United States Supreme Court has

"identified three factors as having particular significance in the analysis of whether a taking has occurred: (1) '[t]he economic impact of the regulation on the claimant,' (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations,' and (3) 'the character of the governmental action.'" *Alegria*, 687 A.2d at 1252 (quoting *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978)).

In addition, that Court has "prefer[ed] to 'engag[e] in * * * essentially ad hoc, factual inquiries'" in takings cases, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798, 812 (1992) (quoting *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648), although it has designated "at least two discrete categories of regulatory action [that are] compensable without case-specific inquiry into the public interest advanced in support of the restraint." *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d at 812. These categories are (1) "regulations that compel the property owner to suffer a physi-

cal 'invasion' of his property" and (2) "regulation[s] [that] den[y] all economically beneficial or productive use of land." *Id.* at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d at 812–13; *see also Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112 (1980) (observing that a taking occurs in situations in which a regulation "does not substantially advance legitimate state interests * * * or denies an owner economically viable use of his land").

█ Moreover, just compensation has not been limited to those instances in which a taking is permanent in nature. As the United States Supreme Court has held, '"[T]emporary' takings which * * * deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 318, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250, 266 (1987).

In the case before us, the hearing justice found that "[a]n examination of the various factors deemed relevant to a takings analysis is premature." The decision to grant summary judgment in favor of DEM rested on her conclusion that "[t]he initial assertion of regulatory jurisdiction over the wetlands at Woodland Manor amounted to nothing more than an exercise of authority by the DEM of the type referred to [in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), and *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796 (Fed.Cir.1993) ]. In its 1986 letter to Mapleroot, the DEM merely sought to bring the developers within the ambit of its wetlands permitting process." We disagree with this characterization of the 1986 letter.

The justice opined that "at issue herein is whether the peculiarities of this particular case and, specifically, [the Superior] Court's 1994 decision [estopping DEM from requiring Woodland to file a formal wetlands application for phase 4 and ordering DEM to process the construction and review plans] transformed [DEM's] initial assertion of jurisdiction into a compensable constitutional taking." But, properly framed, the issue before the justice was whether the DEM's *1986*

*denial letter* effected a temporary taking between 1986 and 1994.

■ It is well established that "the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126, 106 S.Ct. 455, 459, 88 L.Ed.2d 419, 426 (1985). Although we conclude that DEM's 1974 letter constituted a "mere assertion of jurisdiction," this factor is not dispositive of the temporary takings claim asserted by Woodland. In her 1994 decision, the justice specifically found that DEM had "delimit[ed][its] jurisdiction" by establishing the 247.5–foot contour line in 1974, and further found that DEM was "equitably estopped from requiring a formal wetlands application on the basis of any disturbance above the 247.5 foot elevation that does not adversely impact areas below the elevation and otherwise within the [DEM's] jurisdiction." In its 1986 denial letter which required a formal wetlands application, DEM essentially expanded the parameters of its self-imposed jurisdictional limitations. Consequently, the granting of DEM's motion for summary judgment precluded the necessary examination of whether Woodland had suffered a compensable taking for the period between the 1986 denial letter and the Superior Court's 1994 decision determining that DEM was equitably estopped from imposing requirements on Woodland Manor III beyond the parameters of the 1974 letter.

In fact, the cases cited by the hearing justice in her decision granting summary judgment support our conclusion. In *Riverside* the United States Supreme Court addressed the issue of "whether the Clean Water Act * * * together with certain regulations promulgated under its authority by the Army Corps of Engineers, authorizes the Corps to require landowners to obtain permits from the Corps before discharging fill material into wetlands adjacent to navigable bodies of water and their tributaries." 474 U.S. at 123, 106 S.Ct. at 457, 88 L.Ed.2d at 424. The *Riverside* Court observed that

"[a] requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only *when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question* can it be said that a taking has occurred." *Id.* at 127, 106 S.Ct. at 459, 88 L.Ed.2d at 426. (Emphasis added.)

The *Riverside* Court underscored that "[w]hether the denial of a permit would constitute a taking in any given case would depend upon the effect of the denial on the owner's ability to put the property to productive use." *Id.* at 127 n. 4, 106 S.Ct. at 459 n. 4, 88 L.Ed.2d at 426 n. 4. Particularly relevant to the case before us is the *Riverside* Court's observation that

"[b]ecause the [Army Corps of Engineers] has now denied [the landowner] a permit to fill its property, [the landowner] may well have a ripe claim that a taking has occurred. On the record before us, however, we have no basis for evaluating this claim, because no evidence has been introduced that bears on the question of the extent to which denial of a permit to fill this property will prevent economically viable uses of the property or frustrate reasonable investment-backed expectations." *Id.* at 129 n. 6, 106 S.Ct. at 460 n. 6, 88 L.Ed.2d at 427 n. 6.

In *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796 (Fed.Cir.1993), which was also cited extensively by the hearing justice, the plaintiff landowner sought compensation for a temporary taking alleged to have occurred between the date on which the government issued a cease and desist order requiring the plaintiff to obtain a permit before engaging in any filling of wetlands, and the date on which judgment that the government had not properly exercised jurisdiction over the plaintiff's property became final. *Id.* at 798–99. The Court of Federal Claims granted the government's motion for summary judgment only *after* assessing and rejecting the

arguments that the plaintiff "had been deprived of all, or substantially all, economically viable use of its property during the alleged period of the taking" and that "the delay was inherently unreasonable because the [government] did not have jurisdiction over the property." *Id.* at 799. In affirming the grant of summary judgment, the Federal Circuit Court of Appeals emphasized that the cease and desist order did not constitute a taking because the order, "while stopping the filling of wetlands, *specifically left the door open to development by obtaining a permit.*" *Id.* at 800–01. (Emphasis added.) Characterizing the ability to obtain a permit as an "escape hatch," *id.* at 801, the court reasoned that "preliminary regulatory activity [such as requiring a permit] does not effect a taking in the constitutional sense." *Id.* at 802. The court concluded that "[a]s a matter of law, the possibility of a permit precludes the order itself from constituting a taking. * * * Plaintiff was not precluded from development; it was precluded from development without a permit." *Id.* at 801 (citing *Riverside*, 474 U.S. at 127, 106 S.Ct. at 459, 88 L.Ed.2d at 426).

■ In the case before us, Mapleroot, in practical effect, was denied a permit in 1986. The 1994 decision found unequivocally that "[b]y stating in the 1986 letter [that] 'this project has the highest probability of being denied by the Department's Freshwater Wetlands Section,' the [DEM] established the futility of pursuing administrative procedures to resolve the dispute." Moreover, counsel for DEM asserted at the hearing on its motion for summary judgment that the Superior Court had, in 1994, "found futility. We're not denying that. But all that meant, all the futility meant was that the Court would deem the DEM's actions [in 1986] as if it was more than just a requirement that you file a permit, that it was tantamount to denial of the permit itself." Here, then, unlike the scenario in *Tabb Lakes,* the door to development by obtaining a permit was apparently closed. Thus, according to the pronouncement in *Riverside,* further factual inquiry was necessary to resolve genuine issues of

material fact in assessing the validity of Woodland's temporary takings claim. Hence, the granting of summary judgment was error. The trial justice may well conclude after trial that a compensable taking did not occur. It is our opinion, however, that numerous questions of fact preclude a summary judgment on Woodland's claim.

Among the factual issues that should be determined at a trial on the merits are these: the extent, if any, to which the permit denial prevented economically viable uses of the subject property and the extent, if any, to which denial of the permit frustrated distinct and reasonable investment-backed expectations. Also at issue is whether and to what extent Woodland, in acquiring title to the subject property, was entitled to any damages accruing from Mapleroot's cause of action, including any actual development costs applicable to phase 4 incurred prior to 1986.[5]

■ Because the 1994 decision was not appealed by the parties, that decision became the law of the case. *Richardson v. Smith,* 691 A.2d 543, 546 (R.I.1997). In addition, damages, if any, would be limited to alleged losses incurred only by the impeded development of the approximately twenty acres reserved for phase 4 and not on the basis of the entire eighty-nine acre parcel originally owned by Mapleroot. Any damages would be further limited to those accruing above the 247.5 foot contour line.

We certainly share the hearing justice's reluctance to undermine "the strong public policy interest in land use regulation," but our conclusion here is informed by the admonition that "regulations that leave the owner of land without economically beneficial or productive options for its use—typically * * * by requiring land to be left substantially in its natural state—carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm." *Lucas,* 505 U.S. at 1018, 112 S.Ct. at 2894–95, 120 L.Ed.2d at 814. Our concern that such "regulations" may have been ap-

5. In some circumstances, severance damages to the remaining portions of the property may be available. Here, however, no such damages appear to be implicated.

plied here cautions against a disposition of this case absent a more detailed factual inquiry.

Because a trial on the merits is necessary to resolve genuine issues of material fact in this case, we sustain the plaintiff's appeal and vacate the judgment of the Superior Court, to which we remand the case for further proceedings consistent with this opinion.