DECISION
This matter is before the Court on the September 28, 1994 Amended Complaint of Woodland Manor III Associates, L.P. (plaintiff). The plaintiff seeks monetary damages from Andrew McCleod, in his capacity as Director of the Department of Environmental Management (defendant),[1] pursuant to the Fifth Amendment of the United States Constitution for the alleged temporary inverse condemnation of real property (property) arising from the defendant's actions regarding requirements for the issuance of a freshwater wetlands permit.
In 1974, Mapleroot Development Corporation (Mapleroot), a Rhode Island corporation, was the owner of an eighty-nine acre parcel of land located in the Town of Coventry, Rhode Island.[2] Rocchio, Assalone, and Confreda entered into an agreement with Antonio L. Giordano (Giordano), a real estate developer and the principal of Consultants, Inc., a consulting business, to develop the real estate utilizing financing avenues associated with mortgage insurance programs from the United States Department of Housing and Urban Development (HUD). Rocchio, Assalone, and Confreda also engaged the services of C.E. Maguire, an engineering firm, and Mast Construction, Inc., a general building contractor and a Giordano business entity, to assist in developing the real estate.[3]
In February 1974, Mapleroot filed with the defendant a Request for Freshwater Wetlands Applicability Determination (Request) proposing a Planned Unit Development (PUD), which was to include buildings of various uses to be combined as an integrated, cohesive whole [and] [a]lthough conceived ultimately to work together as a whole or unit, the buildings were to be constructed not concurrently but in phases. WoodlandManor III Associates v. Durfee, C.A. 89-2447, February 10, 1994, Gibney, J. The four phases were as follows: phase one, Woodland Manor I, an apartment complex; phase two, Woodland Manor II, a housing facility for the elderly; phase three, Coventry Health Center, a nursing home; and phase four, Woodland Manor III, a condominium complex. For financial and tax purposes many business entities were used in implementing each phase of the project. However, these various entities comprised the same individual persons and operated as coadunate components of the larger business enterprise. Id. Giordano testified that at the time relevant to this action the general partners of the plaintiff were Giordano, Rocchio, Assalone, and Confreda (collectively principals).[4]
In response to the Request and as part of the preliminary determination, Robert Rocchio, a project manager with C.E. Maguire, and Michael Pickering (Pickering), a wetland biologist with the defendant, conducted an on-site inspection of the real estate and flagged the wetland area in accordance with applicable regulations. In recording the measurements of the wetland line, as established by the flags, on a contour map of the area, Robert Rocchio and Pickering concluded that the wetland line was mostly located along the 247.5 foot contour line, with some flagged points above and some flagged points below this contour line. Robert Rocchio and Pickering agreed that the 247.5 foot contour line would delineate the wetland area and establish the limit of disturbance for construction of the PUD. Attached to this Request [and] filed in accordance with this procedure was a site plan prepared by C.E. Maguire. . . . In response to this [R]equest the [defendant] sent [Mapleroot] a letter dated June 17, 1974 (the 1974 letter) which stated in part that:
 Provided there is no construction or regrading below the [2]47.5 foot contour line as shown on the above-referenced plan and that final grading and drainage plans and computations are submitted for review and approval of the Department prior to start of construction, it is our conclusion that the Fresh Water Wetlands Act does not, at this time, appear applicable to this proposal.
Id. This 1974 site plan was not proffered at the instant trial as neither Giordano nor the defendant had a copy in their records. However, a 1975 site plan was submitted and Robert Rocchio identified the 247.5 contour line on this site plan as the wetland line that he and Pickering had delineated.
After receiving this letter from the defendant, Giordano, as the primary developer and as a representative of the other principals via Consultants, Inc. and Mast Construction, Inc., presented the project to the various state and town regulatory agencies whose approval would be needed for the project to move forward with the finalizing of architectural designs and financing proposals.[5] For example, Giordano received approval from the Department of Health for the construction and operation of a 3.5 mile forced main sewer line and a sewerage pumping station to transport the sewerage generated from the PUD to the Town of West Warwick sewerage treatment facility.[6] Giordano also petitioned the Town of Coventry Town Council, which voted to amend the zoning ordinance and approve the PUT) design.
For phases one, two and three of the PUD, the defendant did not require Mapleroot to obtain a freshwater wetland permit by making a formal application. In arranging the financing and HUD mortgage insurance, Giordano and the other principals, under the trade name Woodland Manor Associates, would apply to HUD for mortgage financing insurance under the appropriate loan program associated with each phase.[7] Giordano testified that after Woodland Manor Associates received the final commitment letter from HUD, the principals would form a limited partnership, comprised of the general partners Giordano, Rocchio, Assalone, and Confreda, to own, develop, and operate that particular phase of the PUD. Giordano testified that he would form this limited partnership at the HUD real estate closing wherein Mapleroot would transfer title of the requisite real property and assign all contract rights and liabilities related to the development of that particular phase of the PUD to this limited partnership. Giordano also testified that the principals utilized the limited partnership business form to generate personal income from the selling of certain tax benefits, such as the tax losses generated by the use of accelerated depreciation, available to real estate owners at that time pursuant to the federal tax code. Giordano testified that the limited partnership would sell, or syndicate, these tax benefits to investors seeking to purchase tax losses and that the proceeds from this syndication would go directly in [the general partners] bank accounts. Another benefit of the limited partnership form is that the principals could syndicate the tax losses without losing majority ownership in the real estate or operational control of the development, as the limited partners were required to maintain passive involvement in the business operations of the limited partnership in order to receive the tax benefits. After the closing, the limited partnership would own the real property and would maintain responsibility for constructing and operating the phase. As required by the HUD approval, Mast Construction, Inc. would then construct each phase.
In addition to the individual development cost of each phase, Giordano testified that each limited partnership was apportioned a share of the total sunk infrastructure cost associated with the entire PUD. Giordano explained that in order for the principals to receive HUD insurance approval for phase one, the limited partnership Woodland Manor I was required to incur an additional two million dollars of infrastructure costs associated with the construction and installation of the forced main sewer line, the sewerage pumping station, the water and utility lines, and the ingress and egress roads throughout the PUD site. Giordano testified that this sunk infrastructure was designed to accommodate the four phases of the PUD and that phases two, three, and four each would be apportioned a proportional share of these costs.[8]
The controversy between Mapleroot and the defendant began in December 1985, when Brian Tefft, the then Senior Natural Resource Specialist for the defendant, informed Assalone that the defendant required Mapleroot to submit a formal application for a freshwater wetlands applicability determination for the final phase of the PUD. Mapleroot and the defendant were unable to resolve their differences regarding this requirement, and in a letter dated August 28, 1986, the defendant formally notified Woodland Manor Associates d/b/a Woodland Manor that phase four had the highest probability of being denied by the [defendants] Freshwater Wetlands Section and that a formal wetland application would be required. Thereafter, on May 10, 1989, Mapleroot filed suit against the defendant
 seeking declaratory judgment, injunctive relief, and damages. Specifically, Mapleroot alleged that [t]o require the filing of [a] new application at this date is in contradiction to the terms of the approval of [1974] and would prejudice Mapleroot inasmuch as [the defendant] contends that the subject wetland is now unique and would result in the denial of the final phase of the construction as originally proposed and approved in [1974]. Mapleroot sought, inter alia, a declaration that [the defendant] was equitably estopped from requiring the filing of a new application for phase [four] and claimed damages for the [defendants] arbitrary, capricious and unreasonable actions which have unreasonably delayed [Mapleroot] and denied it beneficial use of its property for a time certain.
Woodland Manor III Assoc. v. Keeney 713 A.2d 806, 809 (R.I. 1998).
On September 29, 1992, the principals filed a Certificate of Limited Partnership with the Secretary of State forming the instant plaintiff. On September 30, 1992, Mapleroot transferred the subject property by warranty deed to the plaintiff and executed an Assignment Agreement which stated, in pertinent part, that:
 Mapleroot has conveyed to Woodland . . . the last remaining parcel of land to be developed by Antonio L. Giordano and Mapleroot in the Planned Unit Development. . . . Mapleroot has expended certain development costs which Woodland has agreed to either reimburse or assume and has further agreed to assume costs of litigation. . . . Woodland III shall assume any and all development costs still outstanding (sic) with respect to property. . . . Woodland III shall continue to prosecute the litigation in the name of Mapleroot and be responsible for all costs and be entitled to all benefit.
When Mapleroot transferred ownership of the property to the plaintiff, the plaintiff, as the subsequent owner seeking to construct phase four, became the proper party in interest to pursue the equitable relief sought in the then-pending litigation. Therefore, in October 1992, Mapleroot and the defendant filed a stipulation that the plaintiff shall be substituted for Mapleroot pursuant to Rule 25 of the Superior Court Rules of Civil Procedure.
Additionally, the principals, via another limited partnership, sought approval for an alternative development of the property. On October 1, 1992, Giordano, as general partner of Coventry Health Center Associates II, filed a certificate of need application with the Department of Health for the construction of a 120 bed nursing facility named Coventry Village Manor.[9] However, on February 26, 1993, the Department of Health denied this application and the principals were unable to pursue this alternative development plan.
On February 10, 1994, after a two-day nonjury trial, a justice of the Superior Court issued a decision and [j]udgment for [the plaintiff] was entered on March 29, 1994, whereby [the defendant] was equitably estopped from requiring a formal wetlands application on the basis of any disturbance above the 247.5 foot elevation that does not adversely impact areas below the elevation and otherwise within the [defendant's] jurisdiction and was ordered to process the final phase of construction and review the plans submitted. . . . WoodlandManor III Assoc. v. Keeney, 713 A.2d at 809.
However, the plaintiff determined that phase four as originally proposed was impossible, impractical, [and] financially infeasible. . . . Id. at 810. On September 28, 1994, the plaintiff filed an amended complaint which amended the original complaint seeking equitable relief to include the instant temporary inverse condemnation claim and seeking monetary damages. Id. On January 2, 1997, a justice of the Superior Court granted summary judgment in favor of the defendant and dismissed the plaintiffs temporary inverse condemnation claim. On appeal from this decision, our Supreme Court determined that further factual inquiry was necessary to resolve genuine issues of material fact in assessing the validity of [the plaintiffs] temporary takings claim. The Supreme Court also stated that the relevant issues to be explored by the trial justice were inter alia whether and to what extent [the plaintiff], in acquiring title to the subject property, was entitled to any damages accruing from Mapleroot's cause of action. . . . Id. at 813.
Our Supreme Court has recognized that [t]he theories of inverse condemnation and temporary taking are based on the constitutional right to compensation in the law of eminent domain found in the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 16, of the Rhode Island Constitution. Mesolella v. City of Providence508 A.2d 661, 669 (R.I. 1986). It is well-established that in a condemnation proceeding a property owner is entitled to just compensation for the fair market value of the property as of the date of taking. O'Donnell v. State 117 R.I. 660, 665,370 A.2d 233, 236 (1977). In addressing the issue of regulatory taking or inverse condemnation by a governmental agency, our Supreme Court has stated that
 [g]overnmental action short of actual acquisition of property may be a constructive taking or an inverse condemnation . . . within the meaning of the Fifth and Fourteenth Amendments if such action deprives the property owner of all or most of his interest in the subject matter. (Citations omitted). It is not necessary that the plaintiff actually be removed from his property or deprived of its possession, but merely that an interest in the property or in its use and enjoyment be seriously impaired. (Citations omitted).
 The right to just compensation for taking of private property in violation of the Fifth and Fourteenth Amendments, however, is confined to a taking of an interest in property which the United States Supreme Court has defined as the group of rights inhering in the citizens relation to the physical thing, as the right to possess, use and dispose of it. (Citation omitted).
E J Inc. v. Redevelopment Agency of Woonsocket 122, R.I. 288, 290-91, 405 A.2d 1187, 1189 (1979). In other words, when a restriction is so great that the landowner ought not to bear the burden for the public good, the restriction is looked upon as a constructive taking. Annicelli v. Town of South Kingstown.463 A.2d 133, 139 (R.I. 1983). [E]cological or environmental legislation may constitute a taking when all beneficial use of the property is denied to the landowner to benefit the public welfare. . . . Id. at 141. The inverse-condemnation cause of action provides landowners with a means of seeking redress for governmental intrusions. . . Harris v. Town of Lincoln668 A.2d 321, 327 (R.I. 1995).
The Court will conduct a two-tier analysis in determining the merits of the plaintiffs Fifth Amendment takings claim. SeeEastern Minerals International, Inc. v. U.S. 36 Fed.Cl. 541, 548 (1996) (citing M J Coal Co. v. United States, 47 F.3d 1148, 1153-54, cert. denied U.S., 116 S.Ct. 53, 133 L.Ed.2d 18 (1995)). Before analyzing the merits of the plaintiffs claim, the Court must first
 determine whether the proscribed activity is a stick in plaintiffs bundle of property rights. Id. at 1154 (citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1027, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798 (1992)). If so, [the Court] consider[s] whether the Government has interfered with the right such that it must pay compensation. Id.
Considerations relevant to the second tier include the economic impact of the regulation, whether the regulation interfered with distinct investment-backed expectations and the character of the governmental action. Id. (citing Penn Central Transportation Co., 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).
Id. In conducting the first-tier of the analysis, the Federal Courts have recognized the principle that [c]ompensation for a taking is only due to the owner of the property at the time the taking occurred, not to an owner at either an earlier or a later date. Fixel v. U.S. 26 Cl.Ct. 353, 356 (1992) (citingDanforth v. U.S. 308 U.S. 271. 284, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939)); See also Flathead Joint Bd. of Control v.U.S., 30 Fed.Cl. 287, 293 (1993) ([F]or plaintiffs to state a claim for which relief may be granted under the takings clause of the Fifth Amendment, plaintiffs must allege a compensable property interest.).
In recognizing the established precedent concerning a plaintiffs standing to maintain a cause of action for temporary inverse condemnation, the United States Court of Federal Claims has stated that [i]t is an essential element of a takings claim that the plaintiff possess an ownership interest in the property alleged to have been taken. Landers v. U.S., 39 Fed.Cl. 297, 302 (1997) (citing Murray v. U.S. 817 F.2d 1580, 1583 (Fed.Cir. 1987) ([O]nly one possessing an ownership interest in the real property at the time of the taking is entitled to receive the required compensation. U.S. v. Dow 357 U.S. 17, 20-21, 78 S.Ct. 1039, 1043-44, 2 L.Ed.2d 1129 (1958)), and Applegate v. U.S. 35 Fed.Cl. 406, 420 (1996) ([A] claimant must establish that he was the owner of property. . . . (Citation omitted). Whether the claimant alleges that the government took his property . . ., the party must first establish a compensable property interest. Lucas v. South Carolina505 U.S. 1003, 1027, 112 S.Ct 2886, 2899, 120 L.Ed.2d 798 (1992) (citations omitted).). In Applegate v. U.S. supra. the Court of Federal Claims also stated that
 [w]hen the Government takes an individuals private property for public use, the Fifth Amendment ensures that the individual receives just compensation. U.S. Const. amend. V. However, [f]or the reason that compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment. Danforth v. United States 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939). The person entitled to compensation for a taking of property by the Government is the owner of the property at the time of the of the taking. Lacey v. United States, 219 Ct.Cl. 551, 560, 595 F.2d 614, 619 (1979) (per curiam); accord United States v. Dow 357 U.S. 17, 20-21, 78 S.Ct. 1039, 1043-44, 2 L.Ed.2d 1109 (1958); Danforth,
308 U.S. at 284, 60 S.Ct. at 236; see, e.g., Creppel v. United States 33 Fed.Cl. 590, 600 (1995); Cavin v. United States
19 Cl.Ct. 190, 197 n. 4 (1989) (finding no standing to assert takings claim unless party `owned the property at the time of the alleged taking), aff'd in part, revd in part, 956 F.2d 1131 (Fed.Cir. 1992).
 The case law of primary importance to this case is found in Dow and Danforth. [I]t is undisputed that [since] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date receives the payment. Dow 357 U.S. at 20-21, 78 S.Ct. at 1043-44 (quoting Danforth, 308 U.S. at 284, 60 S.Ct. at 236). Furthermore, [i]t is well established . . ., that the Assignment of Claims Act prohibits the voluntary assignment of a compensation claim against the Government for the taking of property. Id. at 20, 78 S.Ct. at 1043 (citing United States v. Shannon, 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321 (1952)).
 Neither Dickinson nor Cooper establish that a claimant may recover damages for a taking of property that occurred prior to his ownership. In fact, in Dickinson, the Supreme Court observed that if the taking began long before purchase, plaintiff's `claim would be barred because he acquired the land after that date.' Dickinson, 331 U.S. at 747, 67 S.Ct. at 1384. Ownership of a property interest is an essential element in a takings claim. A property interest is grounded in a legally enforceable right, not an expectancy. See, e.g., United States v. Petty Motor Co., 327 U.S. 372, 380 n. 9, 66 S.Ct. 596, 600 n. 9, 90 L.Ed. 729 (1946) (finding no property right in expectation that lease would be renewed); Deltoma Corp. v. United States,
228 Cl.Ct. 476, 491, 657 F.2d 1184, 1193 (1981) (holding that mere expectancy is not property), cert. denied, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982).
Applegate v. U.S. 35 Fed.Cl. at 4 19-420. Additionally, the Federal Courts have recognized that a property owner may assign a takings claim if such assignment is a valid assignment pursuant to the Assignment of Claims Act. Specifically, the Court of Federal Claims has stated that
 [a]s binding case law instructs, a party may only receive compensation under the Fifth Amendment for the taking of a property interest. No claimant may ever claim compensation for an interest which he does not own. Accordingly, plaintiffs claims for damages that antecede individual ownership are barred, absent a valid assignment of a previous owners claim under the Assignment of Claims Act.
 Under the Assignment of Claims Act, an assignment [of a claim against the United States] may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The statute protects the Government by disallowing the assignment of contingent claims and enable[s] the Government to deal only with the original claimant. United States v. Aetna Casualty Sur. Co. 338 U.S. 366, 373, 70 S.Ct. 207, 211, 94 L.Ed. 171 (1949) (citing Goodman v. Niblack 102 U.S. 556, 560, 26 L.Ed. 229 (1880), and Spafford v. Kirk, 97 U.S. 484, 490, 24 L.Ed. 1032 (1878)). In keeping with this purpose, the Act prohibits the voluntary assignment of a compensation claim against the Government for the taking of property. Dow, 357 U.S. at 20, 78 S.Ct. at 1043 (citing Shannon 342 U.S. 288,72 S.Ct. 281,96 L.Ed. 321).
Id. at 420-421.
In addressing the issue of whether the plaintiff has standing to assert the instant Fifth Amendment temporary inverse condemnation claim, the plaintiff relies on the law of the case doctrine, the Assignment Agreement, and the party substitution stipulation pursuant to Rule 25(c). First, the plaintiff asserts that the justices factual finding from the trial on the original complaint that [f]or financial and tax purposes many business entities were used in implementing each phase of the project [and] these various entities comprised the same individual persons and operated as coadunate components of the larger business enterprise is dispositive of this issue. The plaintiff argues in its post-trial memorandum that [a]s [the plaintiff] had no separate or independent existence, [the plaintiff] stepped into Mapleroots shoes and assumed Mapleroots rights.
The law of the case doctrine applies only when the question that reaches the second judge is the same one that has already been decided by the first judge. Cipolla v. Rhode Island College,Board of Governors for Higher Education. No. 98-119-Appeal, December 15, 1999 (citing Shaver v. Bohan. 708 A.2d 158, 164 (R.I. 1998)). The question of the plaintiffs standing to maintain a temporary inverse condemnation claim was neither raised before nor decided by the justice during the trial on the original complaint as this trial concerned the plaintiffs entitlement only to equitable relief. This Court notes, as the defendant has argued to the Court in its post-trial memorandum, that during the trial of the original complaint the plaintiff continually maintained it was seeking only equitable relief for the purpose of developing phase four and was not seeking monetary damages or pursuing a Fifth Amendment takings claim. Therefore, after thorough consideration of the plaintiffs argument, the Court finds that this factual finding is not dispositive of whether and to what extent [the plaintiff], in acquiring title to the subject property, was entitled to any damages accruing from Mapleroot's cause of action. Woodland ManorIII Assoc. v. Keeney 713 A.2d at 813.
During the trial concerning the instant claim, the plaintiff asserted to the Court that the defendants actions of requiring a formal freshwater wetland application prevented the plaintiff, as opposed to Mapleroot, from developing and constructing phase four, as the plaintiff has alleged that it is the same limited partnership that would have been formed by the principals at the HUD real estate closing associated with the phase four development as originally planned.[10] Thus, the plaintiff has presented to the Court the alleged damages that the plaintiff hasincurred as opposed to any alleged damages incurred by Mapleroot, as a result of the defendants actions. These damages, as outlined in the plaintiffs post-trial memorandum, include out-of-pocket expenses, infrastructure costs, lost syndication profits, lost rental income, lost builder sponsors profit risk allowance, and accrued interest from the date of the alleged taking. However, the plaintiff was not formed as a limited partnership until September 29, 1992, when the Certificate of Limited Partnership was filed with the Office of the Secretary of State. During the time relevant to the plaintiffs claim, Mapleroot was the sole owner of the property until it transferred such property to the plaintiff on September 30, 1992. The plaintiff purchased the property with knowledge of the defendants restrictions as evidenced by the Assignment Agreement and the Rule 25(c) substitution stipulation. Because the same individuals allegedly comprised the general partners of the limited partnership associated with each phase, and because three of the principals were also shareholders of Mapleroot, the plaintiff, in essence, is asking the Court to disregard the separate business forms utilized by the principles for financial and tax purposes. The plaintiff is requesting the Court to acknowledge that the plaintiff had the requisite rights in the property even though it is undisputed the plaintiff was not formed until September 1992 and had no ownership interest in the property during the time of the alleged taking.
 In the context of takings law, the Court of Federal Claims has recognized that:
 [a] shareholder does not have standing to assert a claim in his own name for a wrong to a corporation. Smith Setzer Sons, Inc. v. South Carolina Procurement Review Panel, 20 F.3d 1311, 1317 (4th. Cir. 1994) (citation omitted). As this court recently noted:
 Individuals undertake to establish separate legal entities for doing business to gamer favorable consequences under federal and state tax and corporate law. The voluntary legal arrangements cannot be invoked for one purpose and disregarded for another. At least, no party has a principled reason for doing so. Nor can the property transfers be deemed ministerial, matters of form, or otherwise irrelevant to a takings analysis.
 Preseault v. United States 27 Fed.Cl. 69, 88 n. 11(1992). [The] Plaintiff . . ., does not have standing.
Eastern Minerals International. Inc. v. U.S. 36 Fed.Cl. 541, 547-48 (1996); See also Palazzolo v. State of Rhode Island, No. 98-333-Appeal, Lederberg, J. (February 25, 2000) at 13 (citingRhode Island Hospital Trust Co. v. Doughton 270 U.S. 69, 81, 46 S.Ct. 256, 258, 70 L.Ed. 475, 479 (1926)). The individual shareholders of Mapleroot, which neither include Giordano nor any future limited partners of the plaintiff, do not have standing to assert a takings claim on behalf of, or in the name of, Mapleroot. The constitutional right to seek redress for the alleged temporary inverse condemnation belongs to Mapleroot as the owner of the property during the time of the alleged taking. It only follows that a limited partnership, comprised of those shareholders and another individual as general partners and any yet-to-be-determined limited partners, which had no cognizable individual ownership interest in the property during the time of the alleged taking, and purchased the property with knowledge of the regulatory restrictions, do not have standing to assert such a claim.[11] Although the principals, as general partners of a limited partnership to be created in the future, collectively may have had an expectancy to receive majority ownership interest in the property, via the transfer of the property from Mapleroot to a limited partnership, and the opportunity for the limited partnership to develop phase four without the defendants regulatory restrictions, this expectancy did not, and does not, create the requisite ownership interest or property right for the plaintiff to maintain the instant Fifth Amendment temporary inverse condemnation claim.
The plaintiff seeks to overcome this requirement by relying on the Assignment Agreement to assert that it has standing to pursue this takings claim. This jurisdiction has long held that parties are bound by the plain terms of their contract. Vincent Co. v.First Nat. Supermarkets. Inc., 683 A.2d 361, 363 (R.I. 1986) (quoting Hiller v. Submarine Signal Co. 325 Mass. 546, 550,91 N.E.2d 667, 669 (1950)). The Court must consider the contract in its entirety and give the words in the contract their plain and ordinary and usual meaning. Spratt v. Forbes 705 A.2d 991, 992 (R.I. 1997) (citing Johnson v. Western National Life Insurance.641 A.2d 47, 48 (R.I. 1994)). In determining the meaning of a contract, the Court must first determine if the contract terms are clear and unambiguous. Our Supreme Court has recognized that
 [i]f a contract is clear and unambiguous, the meaning of its terms presents a question of law for the court. Hodor v. United Services Automobile Association 637 A.2d 357, 359 (RI. 1994). Whether the terms of a contract are clear and unambiguous is itself a question of law, and the court may consider all the evidence properly before it in reaching its conclusion. Westinghouse Broadcasting Co. v. Dial Media, Inc., 122 R.I. 571. 579, 410 A.2d 986, 991 (1980). In determining whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning. Paradis v. Greater Providence Deposit Corp. 651 A.2d 738, 741 (R.I. 1994). We have consistently held that a contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation. W.P. Associates v. Forcier, Inc. 637 A.2d 353, 356 (R.I. 1994).
Rotelli v. Catanzaro 686 A.2d 91, 94 (R.I. 1996). A court may look to the surrounding circumstances of contract formation to determine the parties intended meaning of the words in a contract only when such words are ambiguous and open to more than one interpretation. Vincent Co. v. First Nat. Supermarkets, Inc., 683 A.2d at 363 (citing Golden v. Popper Shoe Corp. 94 F. Supp. 100, 102 (D.Mass. 1950) (applying Massachusetts law)); See alsoClark-Fitzpatrick, Inc./Franki Foundation Co. v. Gill 652 A.2d 440, 443 (R.I. 1994) (when the contract terms are ambiguous, the construction of the terms becomes a question of fact). The Court will enforce the intentions of the parties as manifested in the terms of the contract if those intention[s] can be clearly inferred from [the contract] terms and can be fairly carried out consistent with settled rules of law. Hill v. M.S. Alper Son,Inc. 106 R.I. 38, 47, 256 A.2d 10, 15 (1969) (citations omitted).
After careful review of the Assignment Agreement, the Court determines that the relevant terms are clear and unambiguous. The Assignment Agreement entitled the plaintiff to continue to prosecute the litigation . . ., and be entitled to all benefit. In exchange for this entitlement, the plaintiff agreed either to assume or reimburse Mapleroot for development cost expended [or] still outstanding. In accordance with its plain and ordinary meaning, the term to prosecute is defined as [t]o follow up; to carry on an action or other judicial proceeding. . . . Black's LawDictionary (6th Ed. 1990). The United States Supreme Court has recognized the distinction between the phrases to "commence a suit" and to "prosecute a suit" stating that "[t]o commence a suit, is to demand something by the institution of process in a Court of justice; and to prosecute the suit, is, according to common acceptation of language, to continue that demand." Cohens v.Commonwealth of Virginia, 19 U.S. 264, 408, 6 Wheat. 264, 408, 5 L.Ed. 257 (1821). Our Supreme Court also has recognized the distinction between these phrases by acknowledging that parties can commence and prosecute their intended suit at law. Clark v.Rhode Island Locomotive Works 24 Rd. 307, 53 A. 47 (1902); Seealso Tillinghast v. Westcott, Slade Balcom Co. 30 R.I. 334,75 A. 306 (1910). From the plain and ordinary and usual meaning of this language, the Court determines that Mapleroot assigned to the plaintiff the right to prosecute, and the entitlement to all benefit from, the then-pending cause of action for equitable relief. The Court is unable to conclude from the Assignment Agreement that Mapleroot assigned to the plaintiff other possible causes of actions that were not then-brought before the Court, but nonetheless were available to Mapleroot, had Mapleroot commenced such causes of action against the defendant.
Assuming in arguendo the Court determined that the relevant language of the Assignment Agreement was ambiguous, consideration of the evidence presented at trial leads the Court to findings which result in the same conclusion. The Courts interpretation of the Assignment Agreement, in addition to being supported by the definitions above, is supported by the fact that the plaintiffs alleged and articulated purpose in acquiring the property was solely to develop and operate phase four of the PUD. The Assignment Agreement language that the plaintiff shall continue to prosecute the litigation in the name of Mapleroot and be responsible for all costs and be entitled to all benefit, read in context of the plaintiffs purpose in acquiring the property and the related party substitution in the pending cause of action for equitable relief, evidences that Mapleroot assigned to the plaintiff only the equitable cause of action then-pending in the Superior Court. This is the only relief that would remove the regulatory restrictions and allow the plaintiff to develop and operate phase four. This finding is buttressed by the fact that the equitable relief is the only benefit the plaintiff was seeking during the original trial. The plaintiff demanded this relief at the original trial and affirmatively asserted that it was not pursuing a Fifth Amendment takings claim. Thus, the plaintiffs actions are consistent with the Court's interpretation of the Assignment Agreement.
In fact, these findings of fact and conclusions of law are supported by the plaintiffs own interpretation of the Assignment Agreement stating that [a]t the time Mapleroot transferred the property to [the plaintiff]. Mapleroot assigned all of its interest in the pending litigation to [the plaintiff]. . . . (Emphasis added). Only after the plaintiff received the requested equitable relief that it bargained for via the Assignment Agreement, and after it maintained during the trial of the original complaint that it was not pursuing a takings claim, did the plaintiff inform the Court that the phase four development as originally proposed was impossible, impractical, [and] financially infeasible . . . and seek to amend the complaint. The plaintiff, not Mapleroot, has asserted the instant cause of action via the amended complaint. Although the plaintiff became the proper party in interest to pursue the equitable and injunctive relief sought in the original complaint, at the time Mapleroot transferred its interest in the property to the plaintiff, Mapleroot continued to retain its legal right to pursue a Fifth Amendment takings claim against the defendant.Mendez v. Bowie 118 F.2d 435, 439 (1st Cir. 1941) (By the sale of the property a plaintiff loses his right to an injunction against the defendants. But he is still entitled to damages, if any, for past alleged wrongs connected with the property. (Citations omitted).); See also Walker v. Providence Journal Company,493 F.2d 82, 85-86 n. 6 (1st Cir. 1974). The Court concludes that Mapleroot did not assign to the plaintiff its Fifth Amendment cause of action for the temporary inverse condemnation of the property and its accompanying right to pursue monetary compensation by transferring the property or by executing the Assignment Agreement.
The above determination also is supported by case law interpreting the substitution of parties pursuant to Rule 25(c). The rule does not determine what actions shall survive a transfer of interest by a party it deals only with the mechanics of substitution in an action which does survive under applicable substantive law. General Battery Corp. v. Globe-Union, Inc., 100 F.R.D. 258, 261 (1982). The Rule 25(c) substitution stipulation does not create standing in the plaintiff to pursue the instant Fifth Amendment takings claim. The claim for equitable relief survived the transfer as the plaintiff, the subsequent property owner, became the proper party in interest entitled to pursue this relief. Mapleroot, as the property owner during the time of the alleged taking, remained the proper party to pursue monetary damages pursuant to the Fifth Amendment for the alleged temporary inverse condemnation of its property.
From the above findings of fact and conclusions of law, the Court finds that the plaintiff does not have standing to maintain this cause of action pursuant to the Fifth Amendment of the United States Constitution for the temporary inverse condemnation of the property. Therefore, Judgment shall enter for the defendant.
Counsel shall prepare and submit the appropriate Order for entry of Judgment in accordance herewith, within ten days.
[1] The Mapleroot Development Corporation originally filed this civil action against Robert L. Bendick, Jr., in his capacity as Director of the Department of Environmental Management (DEM). The current named defendant, Andrew McCleod, succeeded Timothy Keeney as the Director of DEM.
[2] Mapleroot is the original plaintiff in this action, and the current plaintiff is the successor in title to the property. Relevant to this action, Mapleroot was a real estate holding company owned by Robert Rocchio (Rocchio), John Assalone, Sr. (Assalone), and Pasquale Confreda (Confreda).
[3] Giordano is the sole shareholder of Antonio Giordano, Inc., which is the owner of Consultants, Inc. and Mast Construction, Inc.
[4] Giordano testified that he did not have an ownership interest in Mapleroot. This Court also notes that Domenic DelVecchio (DelVecchio) was a general partner of the plaintiff as stated in the Certificate of Limited Partnership.
[5] Giordano also represented Mapleroot utilizing the trade names Woodland Manor and Woodland Manor Associates. Additionally, Giordano utilized these trade names to represent the principals collectively.
[6] Giordano testified that Coventry Sewer Associates, Inc. is the owner of the forced main sewer line and the sewerage pumping station and that this corporation leases these facilities to Woodland Improvements, which is a non-incorporated business association that represents Woodland Manor I, Woodland Manor II, Coventry Health Center, and the various commercial users of the sewer facilities. Giordano has a fifty percent ownership interest in Coventry Sewer Associates, Inc.
[7] The principals used a trade name for submitting the mortgage insurance application to HUD because part of the business plan was for Mapleroot to transfer title of the requisite real property associated with each phase to separate limited partnerships which would own, develop, and manage each phase. However, these limited partnerships were not formed until the date of the HUD real estate closing.
[8] The plaintiff has not presented sufficient evidence for the Court to make findings concerning the contractual rights and obligations among Woodland I, Coventry Sewer Associates, Inc., Woodland Improvements, and the plaintiff with respect to the sunk infrastructure costs. The plaintiff presented no evidence that Mapleroot was, or is, liable for these costs with respect to phase four.
[9] Coventry Health Center Associates II was a limited partnership with principals Giordano, Rocchio, Assalone, Confreda, and Del Vecchio.
[10] The Court notes that the principals considered developing the property via another limited partnership, Coventry Health Center Associates II, which proposed a nursing facility named Coventry Village Manor. Additionally, as part of the original business plan for phase four, the general partners of the limited partnership would syndicate the tax losses to limited partners who would own a minority interest in development.
[11] See Palazzolo v. State of Rhode Island No. 98-333-Appeal, Lederberg, J. (February 25, 2000) at 15 (Regardless of whether the government physically takes property in the form of an easement or promulgates regulations restricting the property's use, all subsequent owners take the land subject to the pre-existing limitations and without the compensation owed to the original affected owner.).