DECISION
The Court heard this matter without a jury. The plaintiff, Woodland Manor, III Associates, L.P. (Woodland), brought this claim against the defendant, the Director of the Department of Environmental Management (DEM), alleging that the DEM's demand that Woodland submit a new application in connection with its development of Section 8 housing constituted a taking. The plaintiff seeks just compensation for the damages that allegedly flowed from the taking. This Court finds that the defendant's actions constituted a taking and that the defendant is thus required to pay just compensation to the plaintiff.
 FACTS AND TRAVEL
The long history of this case is well documented. See Woodland ManorIII Assoc. v. Keeney, 713 A.2d 806 (R.I. 1998); Woodland Manor IIIAssoc. v. McCleod, C.A. No. 89-2477, 2000 R.I. Super. LEXIS 17 (R.I. Super. Ct. filed March 2, 2000); Woodland Manor III Assoc. v. Keeney,
C.A. No. 89-2477, 1996 R.I. Super. LEXIS 150 (R.I. Super. Ct. filed Dec. 12, 1996); Woodland Manor III Assoc. v. Keeney, C.A. No. 89-2477, 1994 R.I. Super. LEXIS 23 (R.I. Super. Ct. filed Feb. 10, 1994). To chronicle the relevant facts, this Court revisits the early 1970s, when Mapleroot Development Corporation (Mapleroot) purchased an eighty-nine acre parcel of land in the Town of Coventry for development purposes. The owners of Mapleroot were John Assalone, Sr., Pasquale Confreda, Robert Rocchio, and Dominick DelVecchio.
The design for the land in Coventry was a Planned Unit Development (PUD), which was to include a hodgepodge of buildings that were to be integrated as a cohesive whole. Mapleroot entered into an agreement with Antonio L. Giordano, whereby Giordano would take control of developing the PUD. Even though the project was conceived as a whole, it was to proceed in five distinct phases: a commercial phase, Woodland Manor I, Woodland Manor II, Coventry Health Center, and Woodland Manor III. Woodland Manor I was 150 units of Section 8 housing. Woodland Manor II was 126 units of Section 8 elderly housing. Coventry Health Center was a 300 bed nursing home. The last phase of the PUD, Woodland Manor III, was to be 150 units of multi-family Section 8 housing.
These projects would be financed by loans that were to be guaranteed by the United States Department of Housing and Urban Development (HUD). Since HUD requires each of its projects to be owned by a single purpose entity, Mapleroot and Giordano created entities for each phase of the project that were owned in equal shares. Thus, several "business entities were used in implementing each phase of the project. However, these various entities comprised the same individual persons and operated as coadunate components of the larger business enterprise." Woodland ManorIII Assoc, C.A. No. 89-2477, 1994 R.I. Super. LEXIS 23 at 2.
To proceed with the project, on or about February 4, 1974, Mapleroot filed a Request for Freshwater Wetlands Applicability Determination (RAD) with the Department of Environmental Management[1] (DEM). Once the DEM received the RAD, it would then do an on site inspection to delineate any wetlands and thereafter would decide whether the proposed development would impact the wetlands. If the DEM believed that the development would significantly impact any wetlands, it could then require Mapleroot to submit to the burdensome process of a formal wetlands application. With the RAD, Mapleroot submitted a site plan and map. A wetland biologist for the DEM then inspected the site to flag wetlands and delineated the 247.5 contour line as the limit of disturbance. In a June 17, 1974 letter (1974 letter) sent to Mapleroot, the DEM stated:
 "provided there is no construction or regarding below the 147.5[2] foot contour as shown on the above referenced plan and that final grading and drainage plans and computations are submitted for review and approval of this Department prior to start of construction, it is our conclusion that the Fresh Water Wetlands Act does not, at this time, appear applicable to this proposal."
Mapleroot was thus spared the process of submitting a formal wetlands application to the DEM.
Upon receipt of the 1974 letter, Mapleroot presented the proposal to the requisite state and local agencies. Consequently, Mapleroot expended substantial sums of money preparing the site, which included the design and construction of a 3.5 mile sewer system. In 1978, 1980 and 1981, Mapleroot submitted site plans for the first three phases of the project, respectively, to the DEM. The DEM replied to the submissions with essentially similar letters stating that construction would be allowed provided that "1. Only work specifically shown on the aforementioned site plan is allowed; 2. Adequate measures are taken to prevent sediments from entering adjacent wetlands . . ." As a result, Mapleroot was able to complete the first three phases of the project.
At the time that preparations were under way for the construction of Woodland Manor III, legislation for the Tax Reform Act of 1986 (the Act) was pending; it subsequently became law in October 1986. Of consequence to Mapleroot was the Act's retroactive elimination of the ability of developers to syndicate Section 8 housing projects, which is what Woodland Manor III was set to become. In order to be grandfathered under the law as it existed at that time, Mapleroot must have managed the completion of certain tasks related to the project by deadline dates that were set by the Act. First, Mapleroot must have had a binding contract in place with a developer for construction of the project by March 1, 1986. Secondly, Mapleroot must have secured qualified investors for its syndication project by August 16, 1986. If these deadlines were not met, Mapleroot would fail to qualify for the narrow grandfather provision in the Act, and thus its ability to syndicate the project would have been all but lost.
On August 15, 1985, Giordano, on behalf of Woodland Manor Associates, entered into a contract with Mast Construction (Mast) to develop the project. Mast had been the developer for other phases of the PUD. Per the agreement, Mast then began the process of securing HUD approval for the project. Storm clouds, however, formed on the horizon. In November 1985, the DEM informed Mapleroot that it needed to submit a new application for the last phase of the project, Woodland Manor III. Wetlands Section Review Sheet (March 7, 1986) (Plaintiff's Exhibit 58). On February 28, 1986, however, in accordance with their previous submissions to the DEM for the first three phases, Mast submitted to the DEM only a site plan, drainage plans and calculations for Woodland Manor III. The DEM formally rejected Mast's submission by letter of April 11, 1986. The April 1986 letter references the Wetlands Section Review Sheet, id., wherein Brian Tefft of the DEM stated that a new RAD would have to be filed.
To comply with the DEM's demands-but without harboring any delusion as to its chance of success-Woodland Manor Associates submitted a new RAD to the DEM on August 7, 1986. Thereafter, the DEM inspected the site and concluded that the site was part of a large wetland. By letter of August 28, 1986, the DEM stated:
 "[i]t is our conclusion that this proposal represents a SIGNIFICANT ALTERATION of a Fresh Water Wetland for the following reasons.
 Proposed alteration, including filling, vegetative clearing, grading, building construction, tennis court and drainage installation will result in encroachment, significant loss, disturbance and alteration of the natural characteristics of a freshwater wetland, adversely impacting wildlife habitat value, recreational value, and ground water recharge and quality. Be advised that the public value of the wetland, its outstanding wildlife habitat value and its location within one of this State's primary ground water reservoirs, require that the wetland receive the highest level of protection. As proposed, this project has the highest probability of being denied by the Department's Freshwater Wetlands Section.
 Therefore, a FORMAL application must be made on the enclosed form before further action can be taken by this Department. Upon receipt of your application, this Department will proceed with its processing as required by law."
After holding many meetings over the course of the next two years, the parties still could not resolve their differences. Mapleroot filed an action seeking declaratory and injunctive relief in this Court in May 1989.
During that litigation, Mapleroot sold its interest in the Woodland Manor III project to Woodland Manor, III Associates, the plaintiff, who was subsequently substituted as the proper party pursuant to Sup. Ct. R.Civ.P. 25(b). Mapleroot and the plaintiff also executed an Assignment Agreement, whereby Mapleroot assigned all its interests in the property to the plaintiff.
This Court issued a decision on February 10, 1994, granting the plaintiff equitable relief and estopping the defendant from requiring a new application. Over the defendant's objection, this Court allowed the plaintiff to amend its complaint to include a claim for inverse condemnation for the period of time that the defendant's demand for a new application was in place. This Court then granted the defendant's motion for summary judgment. On appeal, the Rhode Island Supreme Court reversed and remanded the case. This Court then ruled in favor of the defendant on the ground that the plaintiff lacked standing. On appeal, the Rhode Island Supreme Court vacated the judgment and remanded the case to the Superior Court for consideration under the United States Supreme Court'sPalazzolo v. Rhode Island, 533 U.S. 606 (2001).
 ANALYSIS
Standing Pursuant to Palazzolo
The Supreme Court of Rhode Island remanded the present action to this Court for reconsideration in light of the United States Supreme Court's Opinion in Palazzolo v. Rhode Island to determine, inter alia, whether the plaintiff possesses standing to pursue this temporary inverse condemnation claim. See Woodland Manor III Ass. v. McCleod, 786 A.2d 1075 (R.I. 2001). The plaintiff presents several theories supporting its argument that it has standing to pursue the present action. First, relying onPalazzolo, the plaintiff argues that purchasers of property can bring takings claims against government agencies for land use restrictions that existed at the time of purchase, and that, therefore, the plaintiff can maintain this action even though it did not own the property when the defendant perfected the alleged taking. Secondly, the plaintiff argues that the transfer of property and Assignment Agreement executed between the plaintiff and Mapleroot bestowed upon it all of Mapleroot's interests in both the property and the current litigation.
Thirdly, the plaintiff asserts that the stipulation executed by the parties to substitute Woodland Manor III Associates as the plaintiff in the present action pursuant to Sup. Ct. R.Civ.P. 25(c) serves as an independent basis that satisfies the standing requirement. Fourthly, the plaintiff asseverates that it has standing to pursue the temporary inverse condemnation cause of action based upon the doctrine of res judicata from this Court's decision in Woodland Manor III Assoc. v. Keeney, C.A. No. 89-2477, 1994 R.I. Super. LEXIS 23 (R.I. Super. Ct. filed Feb. 10, 1994), wherein this Court labeled the current plaintiff and the former plaintiff, Mapleroot, as "coadunate components of the larger business enterprise." Finally, the plaintiff argues that even if the Court does not find that the temporary inverse condemnation cause of action was transferred in the Assignment Agreement, the plaintiff has standing to bring the action independent of a valid assignment pursuant to G.L. 1956 §§ 34-11-4 and 34-11-28.
In response, the defendant simply asserts that Palazzolo is not relevant to the current action. The defendant states that Palazzolo dealt with notice as opposed to standing. The defendant's position is that the plaintiff lacks standing to pursue the temporary inverse condemnation cause of action. The defendant notes that when Mapleroot was the plaintiff, it stated repeatedly that it was not pursuing a takings claim and that it only sought equitable relief. Thus, the defendant argues that the only valid assignment perfected by the Assignment Agreement was the equitable cause of action, on which the plaintiff succeeded. The defendant states that the right to pursue an inverse condemnation cause of action, if it exists at all, resides with Mapleroot.
A brief discussion of the basic facts and holding of Palazzolo is pertinent. In Palazzolo, a government agency promulgated land use regulations that impacted the value of land held by Shore Gardens, Inc., a Rhode Island corporation. The corporation had one shareholder, Anthony Palazzolo, who received title to the land when the corporation's charter was revoked. There was no standing issue in Palazzolo. A justice of the Superior Court, however, held that since Anthony Palazzolo took title to the land with the land use restrictions in place, he was barred from making a takings claim; the logic being that since Anthony Palazzolo had notice of the land use restrictions when he obtained title to the property, he lacked any reasonable investment backed expectations beyond the existing restrictions. The Rhode Island Supreme Court affirmed the decision of this Court. On appeal to the United States Supreme Court, the United States Supreme Court reversed the Rhode Island Supreme Court as to the notice issue and stated that the post-enactment acquisition of title could not act as a bar to the takings claim.
The United States Supreme Court held that "future generations . . . have a right to challenge unreasonable limitations on the use and value of land." Palazzolo, 533 U.S. at 627. Whereas the right to transfer one's interest in land is one of the fee simple estate's defining characteristics, to prohibit future owners of land from challenging the government's previously enacted land use regulations "would work a critical alteration to the nature of property, as [a] newly regulated landowner is stripped of the ability to transfer the interest which was possessed prior to the regulation. Id. (citing Robert C. Ellickson,Property in Land, 102 Yale L. J. 1315, 1368-69 (1993)). Therefore, "prior owners must be understood to have transferred their full property rights in conveying the [land]." Id. at 629 (quoting Nollan v. CaliforniaCoastal Comm'n, 483 U.S. 825, 834 n. 2 (1987)).
Although the United States Supreme Court did not deal directly with the standing issue in Palazzolo, the Court strongly enunciated that a takings "claim is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction." Such a ruling signals to this Court that a buyer who purchases property with state-imposed restrictions in place — at the very least — has standing to bring a takings claim. Id. at 630.
Here, the defendant's 1986 demand upon Mapleroot that a new application be filed for the development of Woodland Manor III was the act that allegedly commenced the temporary inverse condemnation claim. The plaintiff was not created until September 29, 1992, when its Certificate of Limited Partnership was filed with the Secretary of State. The Assignment Agreement between the plaintiff and Mapleroot and the transfer of property from Mapleroot to the plaintiff occurred on September 30, 1992. When the plaintiff was substituted for Mapleroot as the party plaintiff in the current litigation, the defendant's demand that a formal wetlands application be filed was still in place. This requirement prevented the plaintiff from developing the land as planned. In fact, the defendant's requirement that a formal wetlands application be filed was in place until February 1994, when this Court held that the defendant was "estopped from requiring a formal wetlands application on the basis of any disturbance above the 247.5 foot elevation that does not adversely impact areas below the elevation and otherwise within the Department's jurisdiction." Woodland Manor III Assoc. v. Keeney, C.A. No. 89-2477, 1994 R.I. Super. LEXIS 23, *15 (R.I. Super. Ct. filed Feb. 10, 1994). Thus, from at least September 29, 1992 through February 10, 1994, the plaintiff was the undisputed owner of the land at the same time that the defendant's demand for a formal wetlands application was still outstanding. As a result, the plaintiff has satisfied the standing requirement of alleging injury in fact (defendant's land use restriction) and has shown the requisite interest in the property (ownership).
Regarding the period of time of the alleged taking that passed before the plaintiff owned the property, the plaintiff asserts that its substitution as plaintiff in this matter pursuant to Super. Ct. R.Civ.P. 25(c) allowed it to bring the takings cause of action. The plaintiff, however, misconstrues the rule. "Rule 25 is procedural. It does not provide for the survival of rights or liabilities but merely describes the method by which the original action may proceed if the right of action survives." Charles Allen Wright Arthur R. Miller, Federal Practiceand Procedure § 1952 (1986). "The rule does not prescribe the conditions under which rights of action survive . . . [rather] it governs the mechanics of substitution if under the applicable substantive law the right of action survives." Robert Brydon Kent, Rhode Island Practice vl. 1 § 25.1 (1969) (emphasis in original). Here, the obvious right of action that survived the Rule 25 substitution was the equitable cause of action brought by Mapleroot. The plaintiff has not articulated under what applicable substantive rule of law the takings cause of action survived the Rule 25 substitution.
Enter the Assignment Agreement. Rule 25 is not an independent basis for the plaintiff's standing to pursue a temporary inverse condemnation claim for the period of the alleged taking that occurred prior to their ownership. The Assignment Agreement, however, acts as both the conduit through which the takings cause of action survived the transfer of interest and the basis for the plaintiff's standing to bring this claim. The Assignment Agreement transferred to the plaintiff both Mapleroot's interest in the property and its litigation with the defendant. The Assignment Agreement reads as follows:
 "First: Mapleroot shall convey to Woodland III the Property by good and sufficient Warranty Deed conveying same by good clear and marketable title.
 Second: Woodland III shall assume any and all development costs still our-standing [sic] with respect to the property.
 Third: Woodland III shall continue to prosecute the litigation in the name of Mapleroot and be responsible for all costs and be entitled to all benefit."
Assignment Agreement between Mapleroot and Woodland Manor III (September 30, 1992) (Plaintiff's Exhibit 30).
"[A]ssignment is an act of the parties depending generally on intention, and contemplates a continuation of and transfers the whole claim or debt." Kirkham v. Hickerson Bros. Truck Co., 485 P.2d 513, 516 (Colo.App. 1971) (quoting 6A C.J.S. Assignments § 5 (1975)). "Existing [property] rights are prima facie assignable at law, and the general rule is that any estate or interest in lands and tenements may be assigned . . ." 6A C.J.S. Assignments § 13 (1975) (footnotes omitted). In terms of interpreting the Assignment Agreement, "[c]lear and unambiguous language set out in a contract is controlling in regard to the intent of the parties to such contract and governs the legal consequences of its provisions. Such language is assigned its ordinary, dictionary meaning." Dudzik v. Leesona Corp., 473 A.2d 762, 765 (R.I. 1984) (internal citations omitted).
In the Assignment Agreement, the Court must accord a dictionary definition to the contested term, "litigation," in determining precisely what Mapleroot assigned to the plaintiff by transferring its right in the "litigation." Litigation is defined as "A lawsuit. Legal action, including all proceedings therein. Contest in a court of law for the purpose of enforcing a right or seeking a remedy. A judicial contest, a judicial controversy, a suit at law." Black's Law Dictionary 934 (6th
ed. 1990). Thus, the effect of the Assignment Agreement was to transfer to the plaintiff all of Mapleroot's interest in the entirety of the civil action against the defendant. Included in this assignment to the plaintiff was the power to both bring other claims against the defendant and to seek alternate remedies. There is no language limiting the assignment of the litigation to a specific claim against the defendant.
Moreover, the Assignment Agreement not only details the assignment of the litigation but also details the conveyance of the warranty deed of the property in question from Mapleroot to the plaintiff. The fact that Mapleroot assigned not only the litigation but also conveyed the land for which the litigation was brought further evidences Maplroot's intent to assign all of its rights with respect to the land — including the right to bring a temporary inverse condemnation claim — to the plaintiff. Thus, this Court finds that the Assignment Agreement validly assigns to the plaintiff the right to bring a temporary condemnation claim against the defendant, which ultimately leads this Court to conclude that the plaintiff has standing to bring the current claim.
Finally, though not argued by the plaintiff, this Court notes that once Mapleroot transferred title to the property to the plaintiff, Mapleroot had no interest in maintaining a suit for equitable relief against the defendant. The only interest in the property that Mapleroot had once it transferred title was a claim for inverse condemnation against the defendant. The substitution of the plaintiff for Mapleroot as the proper plaintiff to maintain the claim for equitable relief was accomplished pursuant to Rule 25(c), not by the Assignment Agreement. As to the Assignment Agreement, on the other hand, once Mapleroot had transferred title to the property to the plaintiff, it had no interest to assign to the plaintiff in a claim concerned with the determination of whether the defendant was equitably estopped from requiring a formal wetlands application for property that it no longer owned. The only interest in the property that could be assigned to the plaintiff was Mapleroot's claim for inverse condemnation. Thus, the Assignment Agreement effected that purpose.
The Tangled Web of Takings Analysis
The plaintiff asserts that the defendant's demand for a new RAD constituted a compensable taking. Specifically, the plaintiff argues that period of time from the demand for a new RAD until the 1994 decision constitutes a temporary regulatory taking. The plaintiff posits that the facts of the instant action call for analysis under Penn Central Transp.Co. v. New York City, 438 U.S. 104 (1978). The defendant counters with a myriad of arguments to support its position that there was no taking.
a. Parcel as a Whole Doctrine 
Our analysis begins with a discussion of the defendant's arguments. The defendant first argues that the parcel as a whole doctrine precludes the finding of a taking. In Tahoe-Sierra, the United States Supreme Court's latest pronouncement on the takings issue, the Supreme Court stated that "even though multiple factors are relevant in the analysis of regulatory takings claims, in such cases we must focus on the `parcel as a whole.'"Id. at 1481 (quoting Penn Central, 438 U.S. at 130-31). Quoting PennCentral, the Tahoe-Sierra Court reiterated:
 "[t]akings jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding g whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole — here, the city tax block designated as the `landmark site.'"
Tahoe-Sierra, 122 S.Ct. at 1481 (quoting Penn Central, 438 U.S. at 130-31). The defendant seizes upon this language to argue that since, in the present case, only 20 out of 89 acres were allegedly affected by its actions, there was no taking because the plaintiff cannot show that the parcel as a whole was affected. The defendant asserts that even if the use of one part of a parcel of property is prohibited, since another part of that parcel remains developable there can be no taking. This claim ignores the distinction between the "exceptional circumstance" of per se
regulatory takings under Lucas v. South Carolina Coastal Council,505 U.S. 1003 (1992), and the more routine partial regulatory takings analyzed under the Penn Central factors (discussed in detail below). If this Court were to accept the defendant's parcel as a whole analysis, partial takings would be extinct — to be survived only by categorical takings. The government cannot concoct such a potent, strange brew for itself, thereby diluting takings law to the benign impotence of water.
The importance of the parcel as a whole doctrine is that it prevents landowners from segmenting only those portions of their land that are affected by a regulation for the purpose of claiming that they have been denied all economically beneficial use of that portion of their property, which would allow them to argue that a per se taking transpired. Here, the plaintiff has attempted no such claim. Looking further to the facts of Tahoe-Sierra and Penn Central and to regulatory takings law, this Court cannot agree with the defendant's characterization of the parcel as a whole doctrine.
In Tahoe-Sierra, the United States Supreme Court analyzed the parcel as a whole doctrine against a 32-month moratoria on development for which the plaintiffs argued the creation of a per se takings rule was in order. The Court, however, determined, inter alia, that it must consider the term of the fee simple estate in regard to the parcel as a whole, and that it could not sever a 32-month term from the entirety of the fee simple estate. In their argument for the creation of a per se categorical rule, the plaintiffs in Tahoe-Sierra "disavowed" a Penn Central
analysis. In their rejection of the plaintiffs' per se rule argument, the Court stated that "if petitioners had challenged the application of the moratoria to their individual parcels, instead of making a facial challenge, some of them might have prevailed under a Penn Central
analysis." Id. at 1485; 8A Nichols on Eminent Domain § 27.04[5] at 27-64.
Looking to the facts of Penn Central, the plaintiffs contended that the defendant New York City's Landmarks Preservation Law, through which the plaintiffs were prohibited from adding a fifty story tower on top of Grand Central Terminal, affected a taking of their air rights that required the payment of just compensation. In discussing the parcel of the whole doctrine, the Court stated that the plaintiff could not "establish a `taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development . . ." Penn Central, 438 U.S. at 130 (emphasis added). While acknowledging that a party cannot establish a taking bysimply showing that one property right was affected, the Court was not simultaneously pronouncing that a plaintiff would have to show that every property interest in the parcel was taken in order to succeed on a takings claim. Thus, the plaintiff may still be able to prove that a taking occurred even though the defendant's demand for a new application did not allegedly affect a taking on the entire eighty-nine acre parcel.
Moreover, according to the Warranty Deed executed between the plaintiff and Mapleroot, only the twenty acres in question were deeded to the plaintiff and not the entire eighty-nine acre parcel. See Warranty Deed of September 30, 1992 (Plaintiff's Exhibit 30). As such, this Court's parcel as a whole analysis is confined to those twenty acres. The defendant's demand for a new application reduced the developable land on the twenty acres of Woodland III to only five-plus acres. As our Supreme Court has stated, a "court should consider the impact of the regulation on the value of the entire property to determine if a compensatory taking has in fact occurred." Brunelle v. Town of South Kingstown, 700 A.2d 1075, 1082 (R.I. 1997). This Court finds that the economic impact of the defendant's demand for a formal wetlands application on the plaintiff and its twenty acres was sufficiently significant as to satisfy the parcel as a whole test. Finally, in remanding this case, our Supreme Court limited any possible damages that the plaintiff may have suffered to "the approximately twenty acres reserved for phase 4 and not on the basis of the entire eighty-nine acre parcel originally owned by Mapleroot."Keeney, 713 A.2d at 813. The Supreme Court's order reinforces this Court's finding that the relevant parcel is the twenty — not eighty-nine — acre parcel.
b. Commencement Date of the Alleged Taking 
The defendant next argues that the commencement date of the alleged taking was August 28, 1986, when the defendant denied the plaintiff's RAD and demanded the completion of a formal wetlands application. The defendant points to both Judge Gibney's 1994 decision, which was declared the law of the case by our Supreme Court, and the Supreme Court's 1998 opinion as proof that the settled upon commencement date for the alleged taking is August 28, 1986. Judge Gibney's 1994 decision declared that the defendant "should be equitably estopped from requiring a formal wetlands application . . ." Keeney, 1994 R.I. Super. LEXIS 23 at *15. In their 1998 opinion, the Supreme Court repeatedly referred to the August 28, 1986 denial letter as the relevant date for the commencement of any alleged taking. The Supreme Court stated that "properly framed, the issue before [Judge Gibney] was whether the [defendant's] 1986 denial letter effected a temporary taking between 1986 and 1994." Keeney, 713 A.2d at 811-812. Thus, as a result of the prior pronouncements, the defendant asserts that this Court is not at liberty to change the relevant starting date of the alleged taking.
The defendant argues further that the period of time before the August 28, 1986 denial letter (and presumably after the defendant's demand for a new RAD) is controlled by the mere assertion of jurisdiction rule. As the United States Supreme Court has stated:
 "we have made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does constitute a taking. The reasons are obvious. A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the owner free to use the property as desired . . . Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred."
United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 126-27 (internal citations omitted). The defendant cites Tabb Lakes, Ltd. v.United States, 10 F.3d 796 (Fed. Cir. 1993), for the proposition that the rule extends to erroneous assertions of jurisdiction; the defendant does not explicitly state — but it may be implied from the extensive discussion of the case in its Post-Trial Memorandum — that its assertion of jurisdiction requiring a new RAD from the plaintiff was in error. The defendant's argument proceeds on the assumption that its demand for a new RAD was the "mere assertion of jurisdiction" and that the denial of the RAD and demand for a formal wetlands application was the action that commenced the alleged takings period.
Alternately, the plaintiff asserts that the Supreme Court's statements regarding the commencement date of the alleged taking were obiter dicta.
In Keeney, the plaintiff asserts, the Supreme Court dealt only with the plaintiff's appeal of Judge Gibney's grant of summary judgment in favor of the defendant and that the actual commencement date of the alleged taking was not an issue directly before the Court. Instead of the August 28, 1986 commencement date, the plaintiff advocates the adoption of April 11, 1986 as the date for commencement of the alleged takings.
On February 28, 1986, Mast sent to the defendant a letter containing, inter alia, drainage plans and calculations for Woodland III. The defendant has stated that drainage plans and calculations were never submitted by Mast. The plaintiff's witness, Giordano, however, testified that drainage plans and calculations were attached to the February 1986 letter. Moreover, the defendant did not indicate the absence of either of these as a deficiency in their letter of April 11, 1986 to Mast. This Court finds that the drainage plans and calculations were indeed attached to the February 1986 letter. In response to the February 28, 1986 letter, the defendant sent to the plaintiff a letter dated April 11, 1986, stating:
 "[a]ny additional proposed construction on this site requires a new and separate request for freshwater wetlands applicability determination application and permit. I advised John Assalone[3]
by telecon [sic] of this over two months ago (11/26/85) as he had inquired of this same project at that time. We will process accordingly what [sic] a complete application submission is presented."
Wetlands Section Review Sheet, March 10, 1986 (Plaintiff's Exhibit 21). The plaintiff argues that the April 11th letter signifies the commencement date of the alleged takings because it was at that time that the defendant refused to consider the plaintiff's February proposal and instead required something from the plaintiff above and beyond the defendant's 1974 letter and permit.
This Court notes that the Supreme Court stated in Keeney that the defendant's 1974 letter constituted a mere assertion of jurisdiction and that the defendant was thereafter prohibited from "imposing requirements on [the plaintiff] beyond the parameters of the 1974 letter." Keeney, 713 A.2d at 812. The defendant's April 1986 letter clearly placed demands on the plaintiff beyond the scope of the 1974 permit and letter; namely, the completion and submission of a new RAD. The 1974 permit was based on a RAD filed by Mapleroot and the 1974 permit did not require the filling of subsequent RADs for each phase of the project. In fact, new RADs were neither requested nor submitted for the other phases of the project.
Here, the defendant's refusal to consider the plaintiff's February proposal and demand for a new RAD cannot be viewed as "preliminary regulatory activity" as the defendant argues. Tabb Lakes, 10 F.3d at 801. In this case, the permit process engaged in by the parties occurred in 1974. The defendant's "preliminary regulatory activity" transpired at that time. After twelve years passed and millions of dollars were spent in reliance upon the 1974 permit, the Court cannot accept the defendant's characterization of the April 1986 demand for a new RAD as a mere permit requirement or "preliminary regulatory activity." The facts of this case suggest otherwise. By refusing to consider the plaintiff's February proposal, the defendant, in essence, revoked the 1974 permit, thus prohibiting Mapleroot from developing Woodland III.
The defendant argues that timing of its alleged taking cannot relate back to actions before its August 28, 1986 letter, which stated "this project has the highest probability of being denied." See Tabb Lakes, 10 F.3d at 803. After reviewing the 1974 RAD and issuing a permit, however, the defendant's demand for a new RAD twelve years later could serve only one purpose, and that was to give the defendant an opportunity to block development by denying the new RAD and requiring a formal wetlands application. By requiring a new RAD and effectively denying the 1974 RAD, the defendant made it apparent that a formal wetlands application would be required and that this too had no chance of success. The defendant argues that the "very existence of a permit system implies that permission may be granted." Riverside, 474 U.S. at 126-127. The Court agrees with the defendant's statement, however, when one takes a hard look at the facts of this case, the only implication that can reasonably be drawn from the defendant's April 1986 demand for a new RAD is that the permit would be denied. "Government authorities, of course, may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision." Palazzolo, 533 U.S. at 620 (citingMonterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687 (1999) (emphasis added)).
Finally, the plaintiff here never operated under the fallacy that a new RAD would be accepted. The testimony of the plaintiff's witnesses indicates their conviction that the defendant had resolved not to allow the completion of Woodland III. This resolve was conveyed to Mapleroot through the demeanor of the defendant in conversations and the April letter. This Court is thus satisfied that the appropriate commencement date for the alleged taking is April 11, 1986.
c. Process Delay Rule
The defendant next argues that the process delay rule bars the finding of a taking. The crux of this argument is that the defendant's denial of the permit was in error and that the period of time from the denial through to this Court's 1994 decision is merely a normal regulatory process delay that is not compensable. The defendant argues further that governmental errors — such as wrongfully denying a permit — should be analyzed under the Due Process Clause and not the Takings Clause.
Citing First English Evangelical Lutheran Church of Glendale v. Countyof Los Angeles, 482 U.S. 304, the defendant contends that normal delays in the permitting process are not compensable. Id. at 321. Of course, normal delays in the permitting process are not compensable; there can be no serious argument on that point, however, this case is readily distinguishable from the cases the defendant uses to support its argument. Here, we are not dealing with a process delay, but rather the results of the agency's final decision not to approve the plaintiff's plans.
The defendant asserts that the premise underlying the process delay rule is that the regulatory process is complex, mistakes are made, and that the time it takes to correct mistakes cannot be considered a taking in any sense. This argument is very appealing and seemingly forecloses the need for further analysis on the matter, except that said argument does not properly frame the issue. As Justice Brown dissented inLandgate, Inc. v. California Coastal Comm., 953 P.2d 1188 (CA. 1998), cited by defendant:
 "[t]he majority dodges the otherwise inevitable result by changing the question: "the present case poses the issue of whether a legally erroneous decision of a government agency during the development approval process resulting in delay constitutes a temporary taking of property." "Legally erroneous"? "Process"? "Delay"? Of course mere "delay" in a "process" resulting from an "erroneous decision" does not qualify as a constitutional violation. If it did, every "mistake" by government land use authorities leading to any delay in the owner's use of her property would require compensation. A massive raid on the public fisc would ensue. Suppose, however, the question were differently, more evenhandedly, framed as one that `poses the issue of whether a regulatory decision barring any use of property until the agency's decision is overturned by a court constitutes a temporary taking of property?' What result then? That, rather than the majority's tendentious formulation, is the issue presented by this case."
Id. at 1209 (Brown, J., dissenting) (internal citations omitted). Framing the issue as the defendant would have us do here would be tantamount to accepting a categorical rule that precludes agency mistakes from ever amounting to a taking.
Moreover, this Court has already held that there was a final decision on the part of the defendant that would have made any further resort to administrative processes by the plaintiff an exercise in futility. Therefore, it is not necessary to consider the process delay rule or its two exceptions — extraordinary delay and bad faith — because of that finding. In many of the cases that the defendant cites regarding the extraordinary delay and bad faith exceptions, the plaintiffs in those cases attempted to base the finding of a taking on the occurrence of either of those two exceptions. Here, the plaintiff bases the finding of the defendant's taking on the defendant's final decision not to approve its plan and not on any delay thereby caused. This Court thus finds the process delay rule inapplicable to the instant facts.
d. Due Process 
The defendant argues that the Takings Clause does not apply to this case, this Court finds otherwise. The defendant cites many cases from outside the jurisdiction to support its argument.[4] The defendant does cite the United States Supreme Court decision of Eastern Enterprises v.Apfel, 524 U.S. 498 (1998), as an indication that the Court considers the Due Process Clause the proper route for analyzing improper government actions relating to land use. First, the Supreme Court's ruling inEastern Enterprises does not have the force of precedent.[5] Second, as Justice Kennedy noted in his concurrence, id. at 541-42, unlike other regulatory takings cases, there was no property interest taken in EasternEnterprises, but rather an obligation was imposed by the Coal Act. The offensive government regulation in Eastern Enterprises was retroactive legislation; the constitutionality of which Justice Kennedy argued relied on the legitimacy of Congress's judgment. Justice Kennedy stated that "[the Court] should proceed first to general due process principles, reserving takings analysis for cases where the governmental action is otherwise permissible." Id. at 546.
In the present case, the governmental action involved the regulation of wetlands. The United States Supreme Court has held that the necessity of protecting wetlands through the regulation of privately held lands constitutes a legitimate governmental purpose. See Nollan v. CaliforniaCoastal Comm'n, 483 U.S. 825 (1987); City of Monterrey v. Del MonteDunes, 526 U.S. 687 (1999). Thus, even though the defendant has since been equitably estopped from demanding a new application from the plaintiff, the constitutional legitimacy of wetlands regulations and permit requirements are not in question.
At issue here is not whether there was arbitrary or capricious government action, nor is the issue whether the plaintiff was denied use of its land without due process of law. The facts we have before us are that the government actor defendant made a final decision that the plaintiff could not develop its land because it was a wetland; the plaintiff was precluded from developing its land for the eight years that the agency decision was in place; and the government actor defendant made its decision — not capriciously — but in what it considered to be the best interests of the public: namely the preservation of the supposed wetland. Compare L.A. Ray Realty v. Town Council of the Town ofCumberland, 698 A.2d 202 (R.I. 1997) (analyzing the town council's malevolent actions toward the plaintiffs under the Due Process Clause). These facts signal the applicability of the Takings Clause rather than the Due Process Clause.
e. The Relevant Takings Law
With respect to the relevant takings law, the edict proclaimed by the Fifth Amendment to the United States Constitution that "nor shall private property be taken for public use, without just compensation" is the source of all takings jurisprudence. The Takings Clause of the Fifth Amendment to the United States Constitution is applicable to the states through the Fourteenth Amendment. Chicago, B. Q.R. Co. v. Chicago, 166 U.S. 226
(1897). The purpose of the Takings Clause is to "prevent the government from `forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'"Palazzolo, 533 U.S. at 618 (quoting Armstrong v. United States,364 U.S. 40, 49 (1960)).
The United States Supreme Court has distinguished two categories of takings: physical and regulatory. Philip Morris, Inc. v. Reilly,312 F.3d 24 (1st Cir. 2002) (citing Tahoe-Sierra Pres. Council v. TahoeReg'l Planning Agency, 122 S.Ct. 1465, 1479 (2002)). Physical takings are conspicuous as they are flagged by physical condemnation or the physical appropriation of the property. Tahoe-Sierra, 122 S.Ct. at 1478 n. 17. Analysis of physical takings "involves the straightforward application ofper se rules." Id. at 1478. The predicate of regulatory takings, in contrast, is more difficult to discern and "the analysis is more complex." Id. at 1478 n. 17. Regulatory takings analysis, with one exception, "is characterized by `essentially ad hoc, factual inquiries,'Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978), designed to allow `careful examination and weighing of all the relevant circumstances,' Palazzolo, 533 U.S. at 636 (O'Connor, J., concurring)."Id. at 1478. The one exception — noted above — has been carved out for the "extraordinary circumstance" whereby the regulatory taking permanently deprives the owner of all economically beneficial use of land; such a regulation is a per se taking. Lucas v. South CarolinaCoastal Council, 505 U.S. 1003, 1017 (1992).
In Penn Central, the United States Supreme Court "identified three factors as having particular significance in the analysis of whether a [partial regulatory] taking has occurred: (1) `the economic impact of the regulation on the claimant,' (2) `the extent to which the regulation has interfered with distinct investment-backed expectations,' and (3) `the character of the governmental action.'" Alegria, 687 A.2d at 1252 (quoting Penn Central, 438 U.S. at 124); see Brunelle, 700 A.2d at 1075. Still, the United States Supreme Court has issued the caveat that "PennCentral does not supply mathematically precise variables, but instead provides important guideposts that lead to the ultimate determination whether just compensation is required." Tahoe-Sierra, 122 S.Ct. at 1481 (quoting Palazzolo, 533 U.S. at 634 (O'Connor, J., concurring)). In eschewing the tendency to focus exclusively on one factor in the analysis, the United States Supreme Court has stated that the "outcome instead `depends largely upon the particular circumstances in that case.'" Id. at 1486 (quoting Palazzolo, 533 U.S. at 633 (O'Connor, J., concurring)). Before analyzing the case under the Penn Central test, the Court notes that the defendant neither cited nor made any argument regarding the Penn Central factors.
Examining the facts under the first prong of the Penn Central test, the Court finds it evident that the defendant's actions exerted a significant amount of adverse economic impact on the plaintiff. Mapleroot was about to begin the final phase of a long, multimillion dollar project, when the defendant's actions prevented it from developing Woodland Manor III. The plaintiff points to the loss of the ability to syndicate the project under then existing federal tax laws, along with the lost economic benefits of constructing Section 8 housing because of the elimination of Section 8 projects. Moreover, the plaintiff lost a significant portion of its developable land because of the defendant's characterization of it as wetlands. Ultimately, the plaintiff argues that the impact of the government regulations made the completion of Woodland Manor III commercially impracticable. This Court thus finds that the plaintiff has satisfied the economic impact prong.
The second prong of the Penn Central test is whether the plaintiff had a distinct, reasonable investment-backed expectation as to the property. Here, in 1974, the plaintiff received from the defendant a permit that deliniated the relevant wetlands and demarked the line below which the plaintiff could not build. The defendant knew that this was a multiphase, multimillion dollar project and that the plaintiff would rely on the defendant's findings to determine the extent and feasibility of its project. Here, once the plaintiff obtained the 1974 permit from the defendant, it had distinct, reasonable investment-backed expectation that it could develop the property so long as it did not build below the 247.5 foot wetland marker established by the defendant in 1974. Therefore, this Court finds that the plaintiff has satisfied the second prong.
The third prong of the Penn Central test is to determine the character of the government action. The purpose of the government action here was to prevent the disturbance of wetlands. The State of Rhode Island places a great deal of importance upon the maintenance of its natural heritage, and that is exactly the responsibility with which the defendant has been charged. Even though the defendant's actions here were mistaken, the defendant acted in what it perceived as the best interests of the public. The defendant granted Mapleroot a permit in 1974. Twelve years later, the defendant effectively denied the same permit. The character of this action is not as blatant as a physical invasion of the land; however, the effect of the action was to deny Mapleroot — and subsequently the plaintiff — use of its land for eight years. Thus, the defendant's action was akin to a temporary, yet prolonged, physical invasion. This Court thus finds that the plaintiff has satisfied the third prong in that the government action here is properly characterized as over-zealous regulation that amounted to a temporary taking.
The morass of takings law is replete with contradictions, complex rules, incompatible decisions, and divergent interpretations. What confounds the issue is the attempt to apply intricate rules that work well in resolving one case to the unique facts and situations presented in other cases. To be sure, there are some hard and fast rules. The Court notes, however, that the spirit of the Takings Clause diminishes when landowners are not afforded the protection embodied in it. After considering the facts and relevant law, the Court finds that the defendant's action constituted a temporary taking of the plaintiff's property from April 11, 1986 through March 27, 1994.[6]
Damages: Just Compensation
Having found that the defendant's actions worked a temporary regulatory taking, the final task for the Court is to determine the award of just compensation. Even though the plaintiff here successfully freed its land from the defendant's excessive regulation in 1994, the United States Supreme Court has decided that "[i]nvalidation of the ordinance or its successor ordinance after this period of time, though converting the taking into a `temporary' one, is not a sufficient remedy to meet the demands of the Just Compensation Clause." First English, 482 U.S. at 319. The premise of this reasoning is that once the government's actions work a taking, "no subsequent action by the government can relieve it of its duty to provide compensation for the period during which the taking was effective." Id. at 321.
The plaintiff asserts that it should be compensated for lost syndication ($1,376,091); the value of assigned Section 8 units ($180,000); the fair market lost rental value of raw land ($1,472,155); out of pocket expenses ($333,952.20); depreciation loss on infrastructure ($188,064); interest carrying costs on infrastructure ($647,467); six percent rental profits guarantee ($376,664); and additional rental profits above guarantee ($1,276,481) for a grand total of $5,850,874.20. In addition to this sum, the plaintiff avers that the correct percentage of interest that should be assessed on the award is twelve percent pursuant to G.L. 1956 § 9-21-10.
The defendant asserts that the most the plaintiff should be compensated for is the fair rental value of the raw land for the period from August 1986 through February 1994. The defendant contests that — aside from the fair rental value of the raw land — the other damages for which the plaintiff seeks compensation are not allowable under the Just Compensation Clause. The defendant labels these damages as consequential damages that are not compensable. Further, the defendant argues that even if these damages are recoverable in theory, the plaintiff's failure to have managed the completion of certain tasks relating to the Tax Reform Act of 1986 causes any claim for them to be too speculative to justify an award.
In the first opinion to declare the correct compensation analysis for temporary regulatory takings law, Justice Brennan stated: "Ordinary principles determining the proper measure of just compensation, regularly applied in cases of permanent and temporary "takings" involving formal condemnation proceedings, occupations, and physical invasions, should provide guidance to the courts in the award of compensation for a regulatory "taking."" San Diego Gas and Electric Co. v. City of SanDiego, 450 U.S. 621, 658-9 (1981) (Brennan, J., dissenting); 4A Nicholson Eminent Domain § 14E.05[1] at 14E-50 (3d ed. rev. 2001). In deciding that compensation is required for temporary regulatory takings, the United States Supreme Court relied upon war-time temporary takings law. First English, 482 U.S. at 318-19 (citing Kimball Laundry Co., v.United States, 338 U.S. 1 (1949); United States v. Petty Motor Co.,327 U.S. 373 (1946); United States v. General Motors Corp., 323 U.S. 373
(1945)).
In said cases, just compensation was determined to be the rental value of the property for the temporary takings period. In this case, the plaintiff estimated the lost rental value of the land for the eight years that the land use restriction was in place was $1,472,155. The defendant's expert found that the fair rental value of the property was $985,000. The market value at the time of the taking was determined to be $2,250,000, minus the value of the five plus unaffected acres. The rental value of the land was based on ten percent of the fair market value for each year of the temporary taking. The real estate appraisal valued the land according to its highest and best use. Olson v. United States,292 U.S. 246, 255 (1934); Sweet v. Murphy, 473 A.2d 758, 761 (R.I. 1984). This Court finds the plaintiff's witness's appraisal of $1,472,155 to be a truer representation of the loss the plaintiff suffered than the defendant's witness's appraisal. The Court thus finds $1,472,155 to be an adequate award for the rental value of the land during the time of the temporary taking.
The Supreme Court has declared the measure of the value of the property taken to be "the owner's loss, not the taker's gain." Id. at 319 (quotingUnited States v. Causby, 328 U.S. 256, 261 (1946)). Here, the plaintiff argues that an award of the rental value of the property alone does not adequately compensate it for the taking. The plaintiff also seeks lost rents, profits, and syndication value. The defendant argues that such damages are merely consequential damages and are thus not compensable. The plaintiff counters that rents were guaranteed for the Section 8 housing, which removes any speculation as to those damages, and that Woodland Manor I and II offered accurate indications as to Woodland Manor III's chance of success.
In keeping with other long settled compensation principles derived from eminent domain cases, lost rents and profits are generally not compensable under the just compensation clause because of their speculative nature. 4A Nichols on Eminent Domain § 14E.05[2]. "Future profits depend on so many contingencies that an accurate valuation cannot be based on them. Experience and observation both show that profits projected on paper for the future are more often illusory than real." 4Nichols on Eminent Domain § 12B.09[2] at 12B-64. Moreover, lost rents and lost profits from yet to be established businesses are even more speculative than prospective profits from established enterprises. If, however, these prospective rents and profits can be determined with relative certainty, then they may be compensable.
Before this Court could even consider the plaintiff's claims relating to lost rents, profits, and syndication, the Court would have make factual determinations as to (1) whether the Army Corp Of Engineers would have approved the project; (2) whether the plaintiff had a binding contract in place by March 1, 1986; (3) whether the plaintiff would have been approved by HUD prior to August 16, 1986; (4) whether the plaintiff could have secured qualified investors after the HUD approval but before August 16, 1986, and; (5) whether the project would have been completed within the timeframe set out by the Act. The rents, profits, and syndication damages sought by the plaintiff clearly cannot be characterized as certain. Rather, the road that this Court would have to take to make those determinations is laden with as much speculation and conjecture as the claims themselves. Such speculation has no place in an award for just compensation, for not only must the award be fair to the property owner, but it must also be just to the public. Therefore, even though rents would have been guaranteed for the Section 8 housing and both Woodland Manor I and II provided good indicators of anticipated revenue, the fact that the Court would have to engage in a speculative fact-finding process to even approach those issues precludes the Court from considering damages for lost profits, rent, and syndication.
As to the infrastructure, the plaintiff claims that it should be compensated for lost depreciation and carrying costs on the infrastructure that Mapleroot built in anticipation of the Woodland Manor III project. The plaintiff also claims that it should be compensated for costs associated with the construction preparations, such as consulting fees, architect fees, engineering fees, legal fees, planning fees, drilling fees, and wetland consultations. After the defendant approved the wetlands demarcations in 1974, Mapleroot relied upon those determinations in configuring its project. Assuming that all four phases of the project would be built in accordance with the defendant's demarcations, Maplerooot designed the infrastructure to accommodate all four phases of the project. The plaintiff now seeks to recoup paper loses on the depreciation for its portion of the infrastructure that it could have used during the eight years of the temporary taking. As the plaintiff notes, this case was remanded in part to determine if any infrastructure costs associated with Woodland Manor III were compensable.
The plaintiff submits that it is owed compensation for the amount of depreciation that it could have claimed for each year the defendant's demand was in place. The plaintiff avers that the total dollar amount for the construction of the infrastructure was $2,887,448, and that Woodland Manor III is responsible for 29.09% of that cost ($840,100). The plaintiff states that it could have depreciated $188,064 for the period of time that the defendant's demand was in place. The plaintiff also argues for the inclusion of carrying costs on the depreciation expense. The Court, however, does not find the plaintiff's lost depreciation to be compensable under the just compensation clause. The plaintiff did not cite — nor could this Court find — any case awarding depreciation as part of a just compensation award. Most importantly, the plaintiff here did not carry its burden of proof as to its claim for lost depreciation. The plaintiff inherited an asset — for which, as far as the record before the Court reflects, it never paid — and it now claims that it was injured because it was not allowed to write off an expense it never incurred. The Court did not find the plaintiff's Exhibit 46 telling or helpful. Thus, lost depreciation is not included in the just compensation award.
Regarding the out-of-pocket costs incurred by the plaintiff in the reliance on the 1974 permit, the Court finds that through the credible testimony of Mr. Tousignant, the plaintiff has met its burden of proving not only that the costs were incurred, but also that these costs were lost once the defendant placed its demand for a new application on the plaintiff. Since the plaintiff now feels the project as proposed and prepared for in 1986 is now not feasible, the plaintiff was not able to recoup these costs by following through with the original plan. The Court finds that the plaintiff reasonably relied on the 1974 permit in incurring these costs and that the actions of the defendant caused them to be futile expenditures. The Court thus finds that the out-of-pocket costs incurred by the plaintiff of $333,952.20 are properly included in the just compensation award.
As for the appropriate interest rate to be assessed to the award, the parties, again, differ. The plaintiff argues that pursuant to G.L. 1956 § 9-21-10, the interest rate should be twelve percent. The defendant argues that pursuant to the eminent domain statute, G.L. 1956 §§ 37-6-23
and 37-6-29, the appropriate interest rate is that of the treasury-bill rate. See Ankner v. Napolitano, 764 A.2d 712 (R.I. 2001). The plaintiff argues that eminent domain and inverse condemnation are different animals and that, therefore, the eminent domain statute is inapplicable to inverse condemnation proceedings. Since eminent domain and inverse condemnation differ only in the manner in which the suits are commenced, however, the Court finds that the appropriate statute for determining interest in this case is the eminent domain statute.
Civil action interest awards did not exist at common law and are purely statutory creations. State Dep't of Trans. v. Providence and WorcesterRailroad Co., 674 A.2d 1239, 1244 (R.I. 1996). "Statutory interest is not part of the substantive right but is exclusively an incident attached thereto by legislative fiat after such right has been adjudicated."Andrade v. State of Rhode Island, 448 A.2d 1293, 1295 (R.I. 1982) (citingFoster v. Quigley, 94 R.I. 217, 179 A.2d 494 (1962)). The policy behind the civil action interest award differs from that of the eminent domain statute. It is well-settled that the purpose underlying § 9-21-10 and prejudgment interest statutes in general is to encourage the early settlement of claims and not to merely add interest to the award. SeeLiberty Mut. Ins. Co. v. Tavares, 797 A.2d 480, 487 (R.I. 2002); Barbatov. Paul Revere Life Ins. Co., 794 A.2d 470, 473 (R.I. 2002); Skaling v.Aetna Ins. Co., 742 A.2d 282, 290-91 (R.I. 1999). The civil action interest award also serves the purpose of compensating plaintiffs for the delay in obtaining judgment. Martin v. Lumberman's Mut. Cas. Co.,559 A.2d 1028, 1031 (R.I. 1989). Generally, the civil action interest award is a purely ministerial duty carried out by the clerk of the court. Di Meo v. Philbin, 502 A.2d 825, 826 (R.I. 1986).
Just compensation interest awards, on the other hand, need not be created by statute. See Schneider v. County of San Diego, 285 F.3d 784, 789-90 (9th Cir. 2002). Rather, interest "is both part of the condemnation award itself, and represents part of the just compensation to which a condemnee is constitutionally entitled, arising out of the delay which takes place between the taking of the property and ascertainment of the award." Ankner, 764 A.2d at 714 (quoting 6A Nicholson Eminent Domain § 26E.02[4] at 26E-34-35 (3d. rev. ed. 2000)). Thus, as opposed to being a creation of the legislature, interest on just compensation awards is a constitutional guarantee. The interest applied to just compensation awards in inverse condemnation actions is based on that same constitutional guarantee. In Rhode Island, the legislature has determined that an interest award based on the treasury bill satisfies the constitutional mandate of just compensation. G.L. 1956 §§ 37-6-23
and 37-6-29. As the purpose of the interest rate to be applied under the eminent domain statute is to ensure the constitutional guarantee of just compensation for the delay in payment, it follows that the rate of interest to be applied in inverse condemnation actions, where the application of interest into the award serves the exact same purpose, should parallel the rate used in eminent domain proceedings.
The imposition of prejudgment interest to damage awards is generally considered a legislative, not judicial, function. Andrade v. State ofRhode Island, 448 A.2d 1293, 1296 (R.I. 1982). Whereas, however, the determination of just compensation is a judicial, not legislative function, the determination of the appropriate prejudgment interest rate for just compensation awards is also a judicial function. Therefore, the Court will only apply any legislatively determined interest rate if it satisfies the just compensation requirement. See Monongahela NavigationCo. v. United States, 148 U.S. 312, 327 (1893); Schneider, 285 F.3d at 794.
The Court also finds that awarding the plaintiff interest at the treasury-bill rate satisfies the requirement of just compensation. In NRGCo. v. United States, 31 Fed. Cl. 659 (1994), the Court determined that the appropriate rate of interest for takings was the fifty-two week treasury bill and stated in support of its determination that many takings claims:
 "are not resolved by the courts until many years after the taking. As a result, the [interest] component of the `just compensation' award . . . can approach and even exceed the value of the property taken . . . . A compensation scheme is not `just' if it is not reasonably designed to compensate property owners for the economic harm suffered as a result of the government's delay in paying over the value of the property taken. At the same time, compensation is not `just' if the delayed compensation is calculated in a way that produces a windfall to property owners well in excess of their economic loss."
Id. at 670. Here, if this Court were to award the plaintiff the twelve percent interest rate of § 9-21-10 for the entire period of the taking, the plaintiff would reap a windfall-or at least an award in excess of just compensation, in contravention of constitutional law.
The plaintiff states that in eminent domain proceedings, landowners get paid the value of the land up front and any interest to be applied goes only toward that amount of just compensation over the initial payment that is subsequently awarded by the court. The plaintiff argues that up front payment somehow differentiates the interest payment in that case from inverse condemnation proceedings. This argument lacks merit. As discussed above, the reason for applying interest in either case is the same: to satisfy the constitutional guarantee to just compensation by applying interest on delayed payments. The mere fact that some money has been paid up front in eminent domain proceedings does not cheapen the value of the remainder that is not recovered until a judgment is entered. Similarly, inflating the rate of interest awarded in inverse condemnations actions cannot be justified because no money was paid up front.
Moreover, "[a]s a rule of statutory construction, when a general provision and a special provision cover the same subject matter, this court shall attempt to give effect to both, and if we cannot give effect to both, the special provision prevails." In re Advisory Opinion to theGovernor, 627 A.2d 1246, 1251 (R.I. 1993). Here, the subject matter is prejudgment interest. The special provision deals with eminent domain. The Court finds that the policies underlying the award of prejudgment interest in both eminent domain proceedings and inverse condemnation actions are so essentially similar that applying the rate of interest in the eminent domain statute is preferable to using the general civil action interest rate, which has a distinctly different pedigree.
The plaintiff argues, however, that since the Treasury Department stopped issuing fifty-two week treasury bills two years ago, there is no method for determining the instant rate. The fact of the matter is, however, the treasury bills were issued for most of the years relevant to the instant taking, and therefore, the appropriate treasury bill rates can be determined from the time of the taking through February 2001, when the Treasury Department last issued the fifty-two week treasury bill. The defendant did not address the issue of what interest rate should be applied after the treasury bill ceased being issued. The defendant did argue that the twelve percent rate cannot be applied to the sovereign.Andrade, 448 A.2d at 1295. In Andrade, however, the Rhode Island Supreme Court refused to apply the twelve percent rate to the sovereign because prejudgment interest on a tort claim is not a part of the substantive right of the party or part of the verdict for damages, but rather it is a statutory prescription. Here, since just compensation is a constitutional guarantee, prejudgment interest is part of the damages and substantive right of the plaintiff.
For prejudgment interest accruing after the issue of fifty-two week treasury bills ceased, the specific legislation pegging the prejudgment interest rate to the treasury bill is moot. Therefore, absent any other direction, the Court must resort to the general legislation requiring interest to be assessed at twelve percent.[7] From that time forward till the date of judgment, the Court finds that using the general twelve percent civil action rate appropriately satisfies the just compensation requirement. The Court thus finds that (1) the treasury-bill rate is the appropriate rate of interest from April 11, 1986 through February 2001, and (2) the civil action interest rate of twelve percent will be applied from March 2001 until the date of judgment.
The purpose of the Takings Clause is to protect individuals from bearing an expense more justly distributed on the public as a whole. The purpose is not, however, to fully compensate the owner for any profitable scheme that it may have planned to implement. Even if the Court were to indulge the plaintiff and make the factual determinations necessary to approach the issue of lost profits, rents, and syndication, the Court does not believe those damages are appropriate in the present case. Here, the plaintiff has possession of the land without the previous prohibitions in place. As the members of the limited partnership are successful, sophisticated business people, the plaintiff is in a position to make profitable use of the land. To allow the plaintiff all the benefits of its previous development scheme through a just compensation award, plus the present ability to implement a new profitable use, would create a windfall for the plaintiff at the expense of the public. Here, an award of the fair rental value of the land at its highest and best use for the duration of the temporary taking, the out-of-pocket expenses incurred, along with the fact that the plaintiff now may develop the land, satisfies the requirement of just compensation.
 CONCLUSION
The defendant's action constituted a compensable taking. The plaintiff is awarded the rental value of the land ($1,472,155) and out-of-pocket costs ($333,952.20). Prejudgment interest is awarded thereon at the rate of the fifty-two week treasury bill from April 11, 1986 through February 2001, and at twelve percent from March 2001 until the date of judgment.
Counsel are directed to confer and submit to this Court an order in conformity with this decision.
[1] When Mapleroot filed its RAD, the DEM was called the Department of Natural Resources.
[2] The parties agree that the letter was in error regarding "the 147.5 foot contour" line; it should have stated "the 247.5 foot contour" line.
[3] John Assalone, Sr. was one of the owners of Mapleroot.
[4] The defendant does cite Brunelle v. Town of South Kingston,700 A.2d 1075, for the proposition that arbitrary and capricious government action is examined under the due process clause. Here, however, the plaintiff has not argued — nor has this Court found — that the government action in question was arbitrary or capricious.
[5] In Eastern Enterprises, four justices found that there was a taking but no due process violation. Four justices found that there was neither a taking nor a due process violation, but they also signaled that an erroneous government action cannot be a taking. Justice Kennedy decided that there was no taking but that there was a due process violation. As a result, five justices disavowed takings analysis. In the end, the plaintiffs prevailed, but because the Court could not agree on a single reason for the outcome, the case does not have the force of precedent.
[6] March 27, 1994 was the date that judgment was entered for the decision of February 10, 1994.
[7] The Court notes that prior to the adoption of P.L. 1994, chapter 258 § 1, G.L. § 37-6-23 called for the application of a twelve percent prejudgment interest rate.